Grafton
No. 2002-520

T&M ASSOCIATES, INC.

v.

PETER GOODRICH & a.

Argued: September 10, 2003
Opinion Issued: October 20, 2003

*Devine, Millimet & Branch, P.A.*, of Manchester (*George R. Moore* and *Daniel E. Will* on the brief, and *Mr. Will* orally), for the plaintiff.

*Wiggin & Nourie, P.A.*, of Manchester (*Thomas J. Pappas* and *Gary M. Burt* on the brief, and *Mr. Pappas* orally), for the defendants.

BROCK, C.J. The plaintiff, T&M Associates, Inc. (T&M), appeals from an award of damages to the defendants, Jeffrey and Peter Goodrich, on their

claims that the plaintiff's agent, their father, Morgan Goodrich, breached agreements to share profits with them and intentionally misrepresented his profit sharing obligation. T&M argues that the Superior Court (*Burling*, J.) incorrectly calculated damages. We affirm.

The record supports the following facts. In 1971, Morgan Goodrich and Thomas Jackson formed T&M Surveys, a company specializing in residential survey work. Each man had a fifty-percent interest in the company. When Thomas Jackson died, his fifty-percent interest went to his brother, Gordon.

In 1987, Morgan Goodrich, the defendants and three other men agreed to create a new company, T&M, which was to provide a broad range of engineering and surveying services. The organizers of T&M understood that Morgan was supposed to transfer Gordon Jackson's fifty-percent interest in T&M Surveys plus one percent to Jeffrey Goodrich so that Jeffrey would own fifty-one percent of T&M and Morgan would own forty-nine percent. They also agreed to share profits as follows: Jeffrey, fifty-one percent; Morgan, ten percent; Peter Goodrich, nine percent; and each of the other three organizers, ten percent.

The organizers of T&M understood that Morgan would receive a yearly salary of $60,000. Because they believed that they and T&M could avoid double taxation if Morgan's salary was inflated to include the corporation's profits, T&M's profits were paid to Morgan. Morgan agreed to invest each organizer's share of T&M profits on the organizer's behalf.

In 1994, Morgan and the defendants entered into a written agreement concerning the stock of T&M and profit sharing. Pursuant to this agreement, the profit sharing formula to which the parties had agreed in 1987 was changed so that Jeffrey was to receive fifty-three and one-half percent of the profits and Peter was to receive eleven and one-half percent. The parties also agreed that while Morgan would continue to receive his $60,000 salary through 1994, after 1994 his salary would be entirely invested in the profit sharing accounts. After 1994, Morgan would neither earn nor keep a salary.

In 1998, Morgan informed the defendants that he had never actually transferred Gordon Jackson's stock plus one percent to Jeffrey, as originally planned. Nor had he invested the defendants' shares of T&M profits, electing to keep the profits for himself. The parties agreed either to seek an agreement by the end of 2000 in which the defendants would now purchase Morgan's interest in T&M, or to revert to the 1994 agreement with an amendment. Before such an agreement could be finalized, however, in December 2000, T&M fired the defendants.

Soon thereafter, Morgan met with all T&M employees and stated that he intended to sell the business to another firm. When Morgan failed to arrange for the employees to meet the new management, virtually all of them left T&M. In the meantime, the defendants started their own firm. They employed several former T&M employees and obtained work from several former T&M clients.

Eventually, T&M (of which Morgan was now the sole shareholder) petitioned for a restraining order and damages against the defendants, alleging, among other things, that they had misappropriated company funds. The defendants brought counter-claims for misrepresentation, breach of contract, promissory estoppel and quantum meruit.

Following fifteen days of hearing, the trial court dismissed T&M's claims and ruled in favor of the defendants on their claims for breach of contract and misrepresentation. The court awarded $1,313,176.00 to Jeffrey and $282,271.00 to Peter.

To calculate damages, the court principally relied upon exhibit JJJJ, which was introduced during the testimony of the defendants' expert. This exhibit consisted of tables showing: the gross compensation that Morgan received each year from 1988 to 2000 as would have been reported on his W-2 form; the actual $60,000 annual salary he received from 1988 through 1994; the gross profits, which were calculated by subtracting Morgan's $60,000 annual salary for the years 1988 through 1994 from his W-2 compensation; taxes that would have been paid on the gross profit sharing amounts; net profit sharing amounts computed by subtracting the taxes on profit sharing from the gross profit sharing amounts; the profit allocation due to each defendant; and the value of the profit sharing due to each defendant, assuming that the profits had been invested in the Standard & Poor's (S&P) 500 Index.

On appeal, T&M argues that the trial court erroneously: (1) included over $820,000 of its 2000 profits in the damage calculation; and (2) used the S&P 500 Index to measure the rate of return on the defendants' share of T&M profits from 1988 to 2000.

At the outset, we address the defendants' assertion that T&M failed to preserve these issues for appeal. A party must make "a specific and contemporaneous objection during trial to preserve an issue for appellate review." *Klar v. Mitoulas*, 145 N.H. 483, 488 (2000) (quotation omitted). "This requirement affords the trial court an opportunity to correct an error it may have made and . . . is grounded in common sense and judicial economy. . . ." *Transmedia Restaurant Co. v. Devereaux*, 149 N.H. 454, 457 (2003) (quotations and citation omitted).

■ The defendants contend that because T&M failed to argue that the testimony of the expert witness and exhibit JJJJ were inadmissible, it may not argue on appeal that the trial court's damage calculations, based upon this testimony and exhibit, were erroneous. The defendants misconstrue our preservation rules. T&M does not challenge the admission of the expert's testimony and exhibits on appeal. Rather, it challenges the amount of the damage award. Thus, it was not required to contend that the expert's testimony and exhibits were inadmissible to preserve its appellate arguments.

Having concluded that T&M properly preserved its appellate arguments, we now address their merits. In reviewing damage awards, we view the evidence in the light most favorable to the prevailing party. *Klar*, 145 N.H. at 487. We will overturn a damage award only if we find it to be clearly erroneous. *Id.* New Hampshire law does not require mathematical certainty in computing damages. *Maloof v. Bonser*, 145 N.H. 650, 655 (2000). The law does, however, require an indication that the award of damages was reasonable. *Gallentine v. Geis*, 145 N.H. 701, 703 (2001).

T&M first argues that including over $820,000 of its 2000 profits in the damage calculation was erroneous because Morgan, its agent, never received these profits. T&M asserts that, accordingly, these profits were not part of his contractual obligation to invest and, thus, should not have been part of the damages awarded to the defendants for Morgan's contractual breach.

Contrary to T&M's assertions, neither the defendants' expert nor the trial court included "corporate profits of over $820,000" in their damage calculations. T&M misapprehends the nature of the computations performed by the defendants' expert and the court.

The defendants' expert calculated damages by assuming that all T&M profits were paid to Morgan in all years except 2000. Thus, to compute the net profits due the defendants in each year except 2000, the expert looked at Morgan's gross compensation as would have been reported on Morgan's W-2 form and deducted from that amount the annual salary Morgan was to receive, if any, and the taxes he would have paid on the profit sharing amount.

For tax year 2000, the expert used a different approach. In that tax year, Morgan's gross W-2 compensation was only $93,600. Based upon T&M's 2000 federal income tax return, which showed shareholder income of $795,422, the expert concluded that T&M did not pay Morgan all of its profits that year. The expert assumed, however, that these profits would have been available to Morgan, even if they were not actually paid to him. As the expert explained, in tax year 2000:

[T]he corporation was an S corporation, which meant that any income would have flowed through and been taxed to Morgan Goodrich .... There was in the company income of almost $800,000. What we did is assume that, of the profits, $30,000 should be retained as working capital. Everything else, however, we assume, was available to Morgan Goodrich, and even though he did not, in fact, take the money out, the cash was available for him to take out, and he just decided not to take it out that year.

■ The defendants' expert and the trial court computed Morgan's compensation for tax year 2000 to be $859,022. This amount represents Morgan's W-2 compensation for tax year 2000 ($93,600) plus T&M's profits for that year ($765,422). The expert calculated T&M's profits by taking the shareholder income T&M reported on form K of its 2000 federal income tax return ($795,422) and subtracting $30,000 from it, under the assumption that, as in previous tax years, $30,000 would have remained in the company as working capital. We hold that the evidence supports the trial court's decision to include T&M's 2000 profits in its damage calculation. *See Crown Paper Co. v. City of Berlin*, 142 N.H. 563, 570 (1997) (court's damage calculation supported by evidence where based upon expert testimony and report). We find no error in the trial court's reliance upon the defendants' expert's computations.

T&M further argues that including T&M's 2000 profits in the damage calculations was "improper because it deviated from the terms of the contract." The trial court found, however, that the contract required Morgan to invest all of T&M's profits annually for the benefit of T&M's organizers (including the defendants). For breaching this obligation, the court awarded damages based upon the value of each defendant's share of T&M profits from 1988 through 2000, had Morgan invested them as promised. Including T&M's 2000 profits in its damage calculations was therefore entirely consistent with the court's factual findings.

T&M next argues that the trial court erroneously used the S&P 500 Index to measure the rate of return the defendants' profits would have received had Morgan invested them as promised. T&M contends that absent testimony "as to what Morgan was to have done with the money, how he was to have invested it, or, even, what the defendants would have done with the money had they been investing it on their own," using the S&P 500 Index was unsupported by the evidence and erroneous as a matter of law. We disagree.

The evidence amply supports the trial court's use of the S&P 500 Index. As the defendants' expert testified:

> [It]'s a broad-based index of the largest corporations on the stock market. It's a relatively conservative index, avoids the small cap stocks and the volatility there, and that seemed to be the appropriate index to use to give a fair assessment of what someone, especially individuals of the age of Peter and Jeffrey Goodrich, would have invested in.

While T&M argues that the court committed legal error by relying upon the S&P 500 Index without explaining why it selected this index over any other possible index, such explanation is generally not required. *See Petrie-Clemons v. Butterfield*, 122 N.H. 120, 126 (1982). This was particularly so here, where the defendants' expert was the only expert to testify about damages and the S&P 500 Index was the only index about which he gave detailed testimony.

■ We are unpersuaded by T&M's argument that use of the S&P 500 Index was "purely speculative." Although neither we nor the trial court can say with certainty that had Morgan invested the profits, he would have invested them in stock, as opposed to treasury bills, we "give due weight to the fact that [this] question was made hypothetical" by Morgan's breach. *Baker v. Dennis Brown Realty*, 121 N.H. 640, 646 (1981). We cannot conclude that use of the S&P 500 Index lacked a basis in sufficient relevant data merely because there was no evidence that Morgan or the defendants invested in the companies that comprise the index. *See Indep. Mechanical Contractors v. Gordon T. Burke & Sons*, 138 N.H. 110, 116 (1993). Viewing the evidence in the light most favorable to the defendants, we find no error in the court's use of the S&P 500 Index.

*Affirmed.*

NADEAU, DALIANIS and DUGGAN, JJ., concurred.