Rockingham
No. 2005-126

SYNCOM INDUSTRIES, INC. d/b/a SYNCOM SERVICES

v.

ELDON WOOD & a.

Argued: November 8, 2006
Opinion Issued: March 16, 2007

*Law Offices of Paul M. Monzione, P.C.*, of Wolfeboro (*V. Richards Ward, Jr.* on the brief and orally), and *William S. Gannon, PLLC*, of Manchester (*William S. Gannon* on the brief), for the plaintiff.

*Sheldon, Davis, Wells & Hockensmith, P.C.*, of Keene (*James Romeyn Davis* on the brief and orally), for defendant Eldon Wood.

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for defendant William Hogan.

BRODERICK, C.J. Defendants Eldon Wood and William Hogan, former employees of plaintiff Syncom Industries, Inc. ("Syncom" or "the company"), appeal an order entered after a bench trial in the Superior Court (*McHugh*, J.) awarding Syncom injunctive relief, compensatory and enhanced damages and attorney's fees on its claims of breach of contract, breach of fiduciary duty, and loss of business reputation and goodwill. We affirm in part, reverse in part, vacate in part and remand.

The following facts were found by the trial court or are otherwise supported by the record. Syncom provides cleaning and maintenance services for movie theaters. The company was established in 1995 by its current president and CEO, Matthew Sinopoli.

Wood executed a "key employment contract" with Syncom in June 2001, and served as Syncom's vice-president of sales. Hogan executed a similar contract in September 2001, and served first as an area manager and later as a regional manager. Each contract was for a term of three years and included a section titled "extent of services" that contained the two restrictive covenants underlying Syncom's breach of contract claims:

> The [employee] . . . agrees that for a period of three (3) years (36 months) after termination of his employment, whether with or without cause, the [employee] will not directly or indirectly, solicit business from any of the Company's customers located in any territory serviced by the Company while he was in the employment of the Company. The [employee] also agrees that during such period the [employee] will not become interested in or associated, directly or indirectly, as principal, agent or employee, with any person, firm or corporation which may solicit business from such customers. [The employee] shall not disclose the private affairs of the Company or any secrets or confidential information of the Company which he may learn while in the Company's employ.

Both contracts also provided that "[i]n any successful action by the Company to enforce this contract, the Company shall be entitled to recover its attorney's fees and expenses incurred in such action." Neither contract provided for health insurance.

In addition to the restrictive covenants, which were common to both contracts, Wood's contract contained the following provision pertaining to

compensation: "[T]he Company shall pay to the [employee] during the continuance of this Agreement a fixed compensation at the rate of $1,000.00 per [week] . . . plus commission once sales level is exceeded per discussion with [Sinopoli]." Sinopoli and Wood discussed the manner in which Wood's commission was to be calculated, and various Syncom employees discussed the matter among themselves, but Sinopoli and Wood never reached a final agreement on all the essential terms of a commission agreement.

In late November or early December 2001, while they were still employed by Syncom, Wood and Hogan, along with at least one other Syncom employee, began plans to establish a new movie theater cleaning company, which they envisioned as a competitor to Syncom. On one occasion in December 2001, Wood, Hogan and another Syncom employee, Fabio Flores, met at a restaurant in Connecticut, during working hours, to discuss the establishment of Wood's new company. Also during that month, Wood negotiated with three of Syncom's customers, Regal Brandywine, Regal Burlington and Regal Cumberland, and lined them up as customers for himself upon his departure from Syncom and the establishment of his new company. In late December, Wood asked his father to loan him $30,000 to cover three weeks of payroll costs he expected to incur in the course of providing cleaning services to the three Regal theaters he had lined up as his future customers. On January 2, 2002, Wood's superiors at Syncom confronted him with their suspicions that he was planning to form a rival company. He denied it, but indicated that he would consider doing so, and threatened to breach the restrictive covenants in his employment contract.

After the January 2 meeting, Syncom's senior vice-president of operations, Carl DeSimone, sent Wood a memorandum noting that Wood "not only openly refused to deny, but . . . cemented [his] participation in this offense [attempting to start his own competing business and trying to destroy Syncom] by telling the President of the company, in front of the Sr. Vice President, that [he, Wood] had approached [his] father for funding for [his] start-up company." For that offense, DeSimone informed Wood that he would be suspended without pay from January 14 through January 20, 2002. By letter dated January 14, 2002, Wood resigned from Syncom, citing the lack of commission payments and his suspension. Two days later, with the assistance of legal counsel, Wood filed articles of organization for Big E Theater Cleaning, LLC (Big E) with the Connecticut Secretary of State.

Within two weeks of Wood's resignation from Syncom, Big E began performing cleaning and maintenance at the three Regal theaters Wood had solicited for Big E while he was still employed by Syncom. By the end

of February, Big E had also displaced Syncom at Regal Ronkonkoma (hereinafter, Regal Brandywine, Regal Burlington, Regal Cumberland and Regal Ronkonkoma are referred to collectively as "the Regals"). Within six weeks of his resignation, Wood secured as a Big E client an AMC theater complex in New York City (Empire 25) that he had previously spent six months soliciting for Syncom. Subsequently, Big E entered into cleaning contracts with six other Regal theaters (the diverted Regals) and displaced Syncom at four additional theaters, Imax, Movies 10, Neshaminy 24 and Tinseltown (the non-Regals).

On February 11, 2002, Syncom terminated Hogan's employment. After Wood resigned but before Hogan was terminated, Hogan performed various tasks for Big E such as providing production rates and advising on budgetary matters. One day in early February, before he was terminated, Hogan went to Wood's home during working hours, carrying a stack of papers. At some point in late March or thereafter, several faxes from Hogan containing confidential Syncom information were recovered from Wood's trash. Those faxes were sent on various dates in March 2002. In May 2003, approximately fifteen months after Syncom terminated Hogan, Big E hired him.

In May 2002, Syncom brought a verified petition for declaratory judgment, permanent injunction and other relief against Wood, Hogan and Flores. Specifically, Syncom asked the court to: (1) declare that the defendants were bound by the restrictive covenants in their employment contracts; (2) determine that the defendants, through Big E, solicited business and contracted with theaters in violation of the restrictive covenants; (3) permanently enjoin the defendants from rendering any services to any current or former Syncom customers; (4) require the defendants to provide a complete accounting of their dealings with any current or former Syncom customers; and (5) award Syncom an amount equal to the profits the defendants earned as a result of violating the restrictive covenants. During trial, the court granted Syncom's motion to add a claim for breach of fiduciary duty, for which it sought compensatory and enhanced damages. Hogan filed a counterclaim for breach of contract. Flores defaulted, and the trial court awarded Syncom a judgment of $3,650,000 against him.

Syncom's claims against Wood and Hogan were tried to the court. At trial, Wood argued, among other things, that the restrictive covenants were unenforceable as a matter of law because they were overly broad and otherwise unreasonable, and also were unenforceable because Syncom materially breached the employment contract. Hogan defended on similar grounds.

The trial court denied Hogan's counterclaim for breach of contract and ruled that Wood and Hogan breached both the restrictive covenants and their fiduciary duties to Syncom. Based upon those rulings, the trial court enjoined the defendants from rendering services to any current or former customer of Syncom for a period of eighteen months, starting on January 1, 2005, and awarded Syncom $1,145,700 in compensatory damages, $250,000 in enhanced compensatory damages and $100,000 in attorney's fees. The defendants filed a motion for reconsideration and clarification which the trial court granted to the extent of defining one of the terms in its injunction but otherwise denied. This appeal followed.

Between their two briefs, the defendants raise more than a dozen issues which we will consider in turn. First, however, we identify three issues that have not been preserved for our review because they were not raised in the trial court: (1) Wood's argument that the trial court incorrectly deemed him a fiduciary of Syncom; (2) Hogan's argument that the trial court incorrectly deemed him a fiduciary of Syncom; and (3) Hogan's argument that the trial court erred by failing to apportion damages. *See Tiberghein v. B.R. Jones Roofing Co.*, 151 N.H. 391, 393 (2004) ("It is well established that we will not review issues raised on appeal that were not first presented in the trial forum."); *Bean v. Red Oak Prop. Mgmt.*, 151 N.H. 248, 250 (2004) (explaining that the supreme court may consider the issue of preservation "regardless of whether the opposing party objects on [that] ground[]").

I

Both defendants argue that the restrictive covenants are unenforceable as a matter of law. The covenants obligated the defendants, for a period of three years after leaving Syncom, not to "directly or indirectly, solicit business from any of the Company's customers located in any territory serviced by the Company while [they were] in the employment of the Company" or to become affiliated with a person or organization that solicited such business. The trial court rejected the defendants' arguments that the covenants were unreasonably broad and, consequently, unenforceable. We disagree.

▮▮▮ The law does not look with favor upon contracts in restraint of trade or competition. *Merrimack Valley Wood Prods. v. Near*, 152 N.H. 192, 197 (2005). Such contracts are narrowly construed. *Id.* However, restrictive covenants are valid and enforceable if the restraint is reasonable, given the particular circumstances of the case. *Id.* A covenant's reasonableness is a matter of law for this court to decide. *Id.* To determine the reasonableness of a restrictive covenant ancillary to an employment

contract, we employ a three-pronged test: first, whether the restriction is greater than necessary to protect the legitimate interests of the employer; second, whether the restriction imposes an undue hardship upon the employee; and third, whether the restriction is injurious to the public interest. *Id.* If any of these questions is answered in the affirmative, the restriction is unreasonable and unenforceable. *Id.* In determining whether a restrictive covenant is reasonable, the court will look only to the time when the contract was entered into. *Technical Aid Corp. v. Allen*, 134 N.H. 1, 8 (1991).

The first step in determining the reasonableness of a given restraint is to identify the legitimate interests of the employer, and to determine whether the restraint is narrowly tailored to protect those interests. *Merrimack Valley*, 152 N.H. at 197. Legitimate interests of an employer that may be protected from competition include: the employer's trade secrets that have been communicated to the employee during the course of employment; confidential information communicated by the employer to the employee, but not involving trade secrets, such as information on a unique business method; an employee's special influence over the employer's customers, obtained during the course of employment; contacts developed during the employment; and the employer's development of goodwill and a positive image. *Nat'l Employment Serv. Corp. v. Olsten Staffing Serv.*, 145 N.H. 158, 160 (2000).

Wood argues that the restrictive covenants are unreasonable and thus unenforceable because they: (1) covered theaters that were not Syncom customers when he worked for the company; (2) included areas in which he never operated and theaters with which he never had contact; (3) prevented him from soliciting any theater in a chain with a theater served by Syncom; (4) covered both current and former Syncom customers; and (5) extended for too long. Wood also argues, citing *Technical Aid*, 134 N.H. at 17, 18, that because of Syncom's conduct, the covenants cannot be judicially reformed. Hogan argues that the covenants are unenforceable as to him because: (1) he did not have the type of job with Syncom that allowed him to appropriate the company's goodwill; (2) he worked for Syncom for too short a time to appropriate any of the company's goodwill; and (3) the covenants imposed an undue hardship upon him. Syncom argues, to the contrary, that the covenants reasonably restricted the defendants from doing business with Syncom customers with whom they had no direct contact because Syncom's unique business model provided the defendants with important inside information about all Syncom customers.

■ It is well established in our case law that when the legitimate interest an employer seeks to protect with a restrictive covenant is its goodwill with customers, a covenant that restricts a former employee from soliciting business from the employer's entire customer base sweeps too broadly. *See Merrimack Valley*, 152 N.H. at 198; *Concord Orthopaedics Prof. Assoc. v. Forbes*, 142 N.H. 440, 443 (1997) (holding that restrictive covenant prohibiting physician from competing with former practice for new patients was overbroad); *Technical Aid*, 134 N.H. at 10. Because the restrictive covenants in this case extended to Syncom customers with which Wood and Hogan had no direct contact, they were broader than necessary for the purpose of advancing Syncom's legitimate interest in protecting its goodwill.

■ However, employers also have a legitimate interest in protecting information about their customers gained by employees during the course of their employment. *Id.* at 13. To protect that interest, an employer may restrict a former employee from soliciting business from customers with which that employee had no direct contact, so long as the employee gained significant knowledge or understanding of those customers during the course of his or her employment. *Id.*

The restrictive covenants in this case are broader than necessary to protect Syncom's legitimate interest in information Wood and Hogan may have acquired about Syncom customers during the course of their employment. If that were the intent of the covenants, they could have been written to prohibit the defendants from soliciting business from Syncom customers about which they had gained information while employed by Syncom. But, as drafted, the covenants barred the defendants from soliciting "business from *any* of the Company's customers located in *any territory* serviced by the Company while [they were] in the employment of the Company." (Emphasis added.) It is difficult to imagine how the defendants, had they terminated their employment within several weeks of being hired, could have gained the kind of inside information contemplated by *Technical Aid* with regard to *all* of Syncom's customers in *all* of its territories. And, as the record demonstrates, Syncom hired Wood in part to gain the benefit of Wood's previous experience in the theater industry, which provided him with knowledge of Syncom customers independent of the knowledge he may have gained as a Syncom employee.

■ Moreover, while Syncom appears to argue, at least implicitly, that its "top-down" marketing strategy somehow created a situation in which all of the company's knowledge of its customers could be imputed to every employee, we do not accept that reasoning. In *Concord Orthopaedics*, we held that a medical practice could not prohibit a former employee from

competing with his former employer for new patients. *Concord Orthopaedics*, 142 N.H. at 443. At the same time, however, we rejected the employer's argument that "because [the employee doctor] had actual contact with referring physicians, and those physicians generate new patients, [the employer had] a legitimate interest in all new patients." *Id.* In other words, we declined to "consider new patients a subset of referring physicians." *Id.* While not directly on point, *Concord Orthopaedics* stands for the general proposition that the legitimate interests an employer may protect with a restrictive covenant must be direct and concrete rather than attenuated and speculative. Here, because the restrictive covenants barred the defendants from soliciting all of Syncom's customers, rather than just those customers about which they had gained information while working for Syncom, and because that deficiency in the framing of the covenants is not cured by Syncom's invocation of its top-down marketing strategy, we conclude that the restrictive covenants are broader than necessary to protect Syncom's legitimate interest in its proprietary information.

As a matter of law, the two restrictive covenants at issue are unenforceable because they are unreasonably broad in their scope. Thus we hold that the trial court erred by ruling to the contrary. Accordingly, we reverse that ruling.

■ That is not, however, the end of the matter. Courts have the power to reform overly broad restrictive covenants if the employer shows that it acted in good faith in the execution of the employment contract. *Merrimack Valley*, 152 N.H. at 200. And indeed, Wood argues in his brief that we should not reform the restrictive covenants in light of Syncom's conduct during and after his employment, thus placing the question of reformation before us. We express no opinion on whether the covenants should be reformed as to either or both of the defendants. Rather, as resolution of that issue will require factual determinations, it is for the trial court to consider on remand. Finally, as the defendants have challenged both the geographic and temporal scope of the restrictive covenants, and have properly preserved those challenges, both aspects of the covenants are open to possible reformation.

## II

Wood and Hogan both argue, on multiple grounds, that if the restrictive covenants are not unenforceable as a matter of law, they are unenforceable under the circumstances of this case. While we have ruled that the covenants, as drafted, are unenforceable, the possibility remains that the trial court could reform them as to either or both of the defendants.

Accordingly, in the interest of judicial efficiency, we will consider the defendants' arguments regarding unenforceability.

■ A restrictive clause in an employment contract preventing future competition by the employee may not be enforced where there has been a breach by the employer of his own obligations under the contract. *Laconia Clinic, Inc. v. Cullen*, 119 N.H. 804, 807 (1979). One who is himself guilty of a wrong for breach of contract should not seek to hold his counter-promisor liable. *Id.*

### A. Wood's Arguments for Unenforceability

Wood argues that the restrictive covenants are unenforceable against him because Syncom: (1) breached its employment contract with him by failing to. pay him commissions he claims to have earned; and (2) committed a material anticipatory breach of the employment contract by threatening him with a suspension without pay in violation of RSA 275:43-b, I (1999).

#### 1. Commissions

The trial court held that "because there was never a specific agreement reached as to how commissions were to be calculated, [it was] compelled to conclude that ... Wood ha[d] not sustained his burden of proof that he [was] entitled to recover the sum of $5,370" for unpaid commissions. It also noted that even if Wood had proved that Syncom owed him $5,370 in commissions at the time he resigned, that would not have justified his actions, which cost Syncom far more than the amount Wood claimed to have been owed.

Offer, acceptance, and consideration are essential to contract formation. *Behrens v. S.P. Constr. Co.*, 153 N.H. 498, 501 (2006). There must be a meeting of the minds on all essential terms in order to form a valid contract. *Id.* A meeting of the minds is present when the parties assent to the same terms. *Id.* This is analyzed under an objective standard. *Chisholm v. Ultima Nashua Indus. Corp.*, 150 N.H. 141, 145 (2003). Moreover, the terms of a contract must be definite in order to be enforceable. *Behrens*, 153 N.H. at 501. When there is a disputed question of fact as to the existence and terms of a contract, it is to be determined by the trier of fact. *Chisholm*, 150 N.H. at 145. In such circumstances, we will sustain a trial court's findings and conclusions unless they are lacking in evidentiary support or tainted by an error of law. *Behrens*, 153 N.H. at 500-01.

The trial court's finding that the parties failed to reach a complete meeting of the minds concerning the calculation of commissions is

supported by the record. Moreover, this is not a case such as *Ives v. Manchester Subaru, Inc.*, 126 N.H. 796 (1985), in which the trial court accepted one party's version of a commission agreement over the version propounded by the other party, *see id.* at 799. Rather, this is a case in which the trial court essentially rejected both parties' versions, terming the commission formula "a work in progress when [Wood] left the company."

■ While the record establishes that Syncom agreed to pay Wood commissions once his sales reached $200,000, it also supports a factual finding that the parties reached no agreement regarding how commissions were to be calculated on sales made partly by Wood and partly by other Syncom employees. Obviously, that was a matter of some importance. Given that Syncom had operated for more than five years prior to hiring Wood as the company's first salesman, and, necessarily, had made sales prior to Wood's hiring, it is reasonable to conclude that at the time Wood was hired, there were partially developed sales "in the pipeline" to which Syncom employees other than Wood had contributed. Moreover, the record demonstrates that Wood himself involved other Syncom employees in the sales process. However, notwithstanding the participation of other Syncom employees in sales, the record demonstrates that the parties in this case, unlike those in *Galloway v. Chicago-Soft*, 142 N.H. 752, 755 (1998), reached no agreement concerning the manner in which credit for sales was to be given to the various Syncom employees involved in making a particular sale. Because Syncom and Wood reached no agreement on this essential term, there was no enforceable commission agreement. Accordingly, the trial court correctly rejected Wood's argument that Syncom's failure to pay commissions was a breach of the employment contract, and, therefore, we affirm the trial court's ruling that Syncom's failure to pay commissions was not a breach that excused Wood from complying with the restrictive covenants.

### 2. Disciplinary Action

Wood next contends that the trial court erred by failing to find that the January 10, 2002 disciplinary action was an anticipatory breach that relieved him from his obligation to abide by the restrictive covenants. Specifically, he contends that because the disciplinary action stated in the January 10 letter—suspension without pay for one week—violated RSA 275:43-b, Syncom's threat to impose that action constituted a material anticipatory breach of the key employment contract.

■ An anticipatory breach of contract occurs when a promising party repudiates his obligations either through words or by voluntarily

disabling himself from performing them before the time for performance. *LeTarte v. West Side Dev. Group*, 151 N.H. 291, 294 (2004). The action that qualified as an anticipatory breach in *LeTarte* was a developer's failure, over the course of approximately three years, to make any of the nineteen separate $1,000 payments it owed a landscaping contractor. *Id.* at 295. Similarly, in *Hoyt v. Horst*, 105 N.H. 380 (1964), our other leading anticipatory breach case, the action that constituted an anticipatory breach was a cessation of installment payments on a loan with little or no prospect of resumption. *Id.* at 389. Here, by contrast, Syncom did not threaten a complete abandonment of its obligations under the key employment contract. Rather, it merely signaled its intent to impose a one-week suspension. Because a one-week suspension, in the context of a three-year employment agreement, was hardly tantamount to a complete abandonment of Syncom's contractual obligations, it was not incongruous for the court to determine that the suspension, if actually imposed, would have violated RSA 275:43-b but would not have been an anticipatory breach of the key employment contract. We reject what seems to be the premise of Wood's argument; namely, that any violation of wage and hour laws is a *per se* anticipatory breach that relieves an employee of any obligations he or she may have under a contract of employment. Accordingly, we affirm the trial court's determination that the disciplinary action stated in the January 10 letter was not a material anticipatory breach of the employment contract that excused Wood from complying with the restrictive covenants.

## B. Hogan's Arguments for Unenforceability

Hogan argues that the restrictive covenants are unenforceable against him because Syncom: (1) required him to sign the key employment contract when it was first presented to him, on his first day of employment; (2) breached its employment contract with him by failing to provide him with health benefits; and (3) sought equitable relief with unclean hands.

### 1. Duress

According to Hogan, the restrictive covenants in the key employment contract are unenforceable because he was first shown the contract, and required to sign it, on his first day of work, after he had left his previous employment. Syncom contends that the factual record supports the trial court's rejection of Hogan's argument on this point. Hogan raised the issue of duress in his closing argument, but the trial court appears not to have ruled upon it. On remand, when considering the question of reformation, the trial court must, of necessity, address this issue because duress of the

sort claimed by Hogan is the kind of bad faith that would allow the trial court to decline to reform the restrictive covenants. *See Technical Aid*, 134 N.H. at 17 ("A court may partially enforce an overly broad restrictive covenant if it finds that the employer acted in good faith in the execution of the contract."). If the trial court were to determine that the restrictive covenants could not be reformed due to Syncom's bad faith, then there would be no need to further address their enforceability. However, if the trial court were to determine that Syncom acted in good faith, then it would, necessarily, reject Hogan's argument that the reformed covenants were unenforceable due to Syncom's bad faith. Either way, we leave this issue to the trial court.

### 2. Health Benefits

The trial court found, as a factual matter, that Hogan's employment contract did not obligate Syncom to provide him with health benefits. The court also found that, notwithstanding the terms of the agreement, Syncom offered Hogan partial reimbursement for health coverage, subject to Hogan's obtaining coverage and submitting the paperwork to Syncom, steps that Hogan never took. We cannot say that the trial court's findings are not supported by the record. Accordingly, we reject Hogan's argument that Syncom committed a breach of the employment contract that relieved him of his obligations under the restrictive covenants.

### 3. Unclean Hands

Hogan also argues that when Syncom sought to enforce the restrictive covenants, it had unclean hands because it terminated him without cause and forced him to resort to litigation to collect unpaid wages and expenses. Therefore, according to Hogan, under the principles of equity, Syncom's unclean hands bar it from enforcing the restrictive covenants. In his request for findings of fact and rulings of law, Hogan asked the trial court to find that Syncom failed to pay him certain wages and expenses and forced him to resort to litigation to obtain relief. The trial court granted those requests, but denied a request that it find Hogan had been terminated without cause. Hogan also asked the court to rule that Syncom breached the employment contract by failing to: (1) provide health insurance and profit sharing during his employment; and (2) pay lawful wages and expenses after his termination. The trial court denied that request. While Hogan asked the trial court to rule that failure to pay wages and expenses was a breach of contract excusing his compliance with the restrictive covenants, there is nothing in the record to indicate that Hogan presented the trial court with the argument he makes here, that Syncom's conduct was sufficient to trigger application of the doctrine of

unclean hands. Thus, that issue is not preserved for our review. *See Tiberghein*, 151 N.H. at 393.

## III

Hogan argues that the trial court erred in finding that he "participated in divulging confidential information during the several weeks between when ... Wood quit and when [he] was fired." Specifically, he challenges two of the trial court's factual findings:

> 52. Between January 14, 2002 when Wood resigned and February 10 or 11 when Hogan resigned, the Defendants took confidential and proprietary information and trade secrets belonging to the Plaintiff, including its customer lists, database, files, documents, policies, procedures, quality control program, inspection program, subcontractor labor base, managers, operations people, pricing, past and pending proposals and past and pending sales efforts and sales techniques and contacts, that are critical components of the [Syncom] Model.
>
> . . . .
>
> 56. While still employed with Syncom, Hogan delivered confidential documents, proprietary information and trade secrets of Syncom to Wood's home.

According to Hogan, because the trial court incorrectly determined that he had participated in divulging Syncom's confidential information, it necessarily erred in determining that he violated the non-disclosure provision of the restrictive covenants. In response, Syncom contends that: (1) the trial court properly rejected Hogan's "incredible testimony" that he did not disclose confidential information; and (2) we should defer to the findings of the trial court regarding Hogan's alleged breach of fiduciary duty.

We will uphold the findings and rulings of the trial court unless they lack evidentiary support or are legally erroneous. *Green v. Sumner Props.*, 152 N.H. 183, 184 (2005). We defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses and determining the weight to be given evidence. *Id.*

Finding number fifty-two does not lack evidentiary support. At trial, there was evidence that Hogan faxed Syncom information to Wood. While that information was faxed in March, after Hogan was terminated, he necessarily took that information from Syncom at a time when he had legitimate access to it, *i.e.*, prior to his termination, and it would have been reasonable for the trial court to find, in light of the facts of the case, that Hogan took that information for the purpose of providing it to Wood.

Hogan argues that the material he transmitted to Wood was not confidential or proprietary. While that material was before the trial court, in the form of exhibits, it is not in the record transmitted to us, so we are hardly in a position to question the trial court's characterization of that material as confidential or proprietary. *See Bean*, 151 N.H. at 250 (explaining that when trial evidence is not included in the appellate record, the supreme court "must assume that the evidence was sufficient to support the result reached by the trial court"). Thus, we affirm the trial court's determination regarding finding number fifty-two. Because there is evidentiary support for the trial court's finding that Hogan took confidential Syncom information for the purpose of providing it to Wood, we cannot agree with Hogan that the trial court erred by determining that Hogan violated the non-disclosure provision in the restrictive covenants. Finally, because finding number fifty-two has evidentiary support, and is a sufficient basis for the trial court's determination that Hogan violated the non-disclosure portion of the restrictive covenants, we need not decide whether finding number fifty-six also has evidentiary support.

## IV

Both defendants argue that the trial court's computation of compensatory damages was incorrect. The trial court awarded a total of $1,145,700 in compensatory damages. That total was composed of profits Syncom would have made from the Regals, the diverted Regals, the non-Regals, and Empire 25 from the time of the defendants' departure from Syncom until December 13, 2004, the date of the trial court's post-trial order. According to the defendants: (1) damages for the diverted Regals were improper because those theaters were not Syncom customers when the defendants worked for Syncom, and the defendants never solicited business from those theaters; (2) damages were improper for the non-Regals because, while those theaters were Syncom customers during the defendants' tenure with the company, neither of the defendants ever had any contact with them; (3) all of Syncom's evidence on damages was speculative and inherently unreliable; and (4) the trial court was barred from awarding Syncom its own lost profits because the damages it requested in its petition were limited to the profits Big E earned from the accounts it allegedly stole from Syncom. Because the defendants' first two arguments depend upon the scope of the restrictive covenants, a matter we are remanding, we decline to address them. In addition, because the defendants did not raise their fourth issue before the trial court, it has not been preserved for our review. *See Tiberghein*, 151 N.H. at 393. Thus, we consider only the defendants' third argument, that the trial court awarded damages based upon inherently unreliable evidence and subsequently

misunderstood that evidence. Moreover, because the actual amount of the damage award depends upon the scope of the restrictive covenants, a question we are remanding, we will decide at this point only whether the quality of the evidence before the trial court was sufficient to support *any* award of compensatory damages. We do so because the record is sufficient for such a determination and because resolution of this question may be helpful to the parties on remand.

In reviewing damage awards, we view the evidence in the light most favorable to the prevailing party. *T&M Assocs. v. Goodrich*, 150 N.H. 161, 164 (2003). We will overturn a damage award only if we find it to be clearly erroneous. *Id.* New Hampshire law does not require mathematical certainty in computing damages. *Id.* The law does, however, require an indication that the award of damages was reasonable. *Id.*

We begin by noting that this case is not analogous to *Whitehouse v. Rytman*, 122 N.H. 777 (1982), upon which the defendants rely. In that case, we held that the trial court properly ruled that the plaintiffs failed to sustain their burden of proof on damages when their calculation of prospective lost earnings was, among other things, based upon an assumption—refuted by their own testimony—that the market price for chickens would remain unchanged over time. *Whitehouse*, 122 N.H. at 780. Here, by contrast, Syncom's projected lost profits were supported by the testimony of Matthew Sinopoli which was, in turn, based upon his direct knowledge of how much Syncom charges its customers, how much it pays its contractors, and what its overhead costs are. In sum, we cannot say that the trial court acted unreasonably in relying upon the evidence before it in making an award of damages. However, because a proper calculation of damages will depend upon the scope of the restrictive covenants, we vacate the award of compensatory damages and remand for such further proceedings as the trial court deems necessary.

## V

Both defendants argue that the trial court erred by awarding attorney's fees to Syncom. The key employment contract, however, plainly entitles Syncom to an award of attorney's fees and expenses if it prevails in an action under the contract. Because it may be determined on remand that attorney's fees should be awarded under the employment contract, we decline to decide at this time whether the defendants' litigation tactics warranted an award of attorney's fees under the common law. *See Kukene v. Genualdo*, 145 N.H. 1, 3 (2000). We vacate the award of attorney's fees

for further consideration after the trial court has ruled upon the other remanded issues.

*Affirmed in part; reversed in part; vacated in part; and remanded.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.