

DA 11-0147

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 290

DAWN M. WRIGG, CPA,

        Plaintiff and Appellant,

  v.

JUNKERMIER, CLARK, CAMPANELLA,
STEVENS, P.C.,

        Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
                    In and For the County of Lewis and Clark, Cause No. ADV 2009-632
                    Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Linda M. Deola, Morrison, Motl & Sherwood, Helena, Montana

        For Appellee:

        Sara R. Sexe, Marra, Sexe, Evenson & Bell, P.C., Great Falls, Montana

                           Submitted on Briefs:  September 7, 2011
                                  Decided:  November 22, 2011

Filed:

                _____
                          Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    Dawn Wrigg (Wrigg) appeals from a declaration of the First Judicial District Court, Lewis and Clark County, that Junkermier, Clark, Campanella, Stevens, P.C. (JCCS) could enforce its covenant not to compete against Wrigg.  We reverse.

¶2    Wrigg raises a dispositive issue that we rephrase as follows:

¶3    *Can an employer enforce a covenant not to compete when the employer ends the employment relationship?*

¶4    Wrigg is a certified public accountant.  JCCS is an accounting firm.  JCCS hired Wrigg as a staff accountant to work in JCCS's Helena office in 1987.  JCCS promoted Wrigg to a JCCS shareholder in November 2003.  Wrigg signed her first Shareholder Agreement (Agreement) in January 2004. The 2004 Agreement expired by its terms. Wrigg signed a new Agreement in 2005 and again in 2007.  The 2007 Agreement expired by its terms on June 30, 2009.

¶5    All the Agreements included an identical JCCS covenant.  The JCCS covenant's relevant terms stated:

> If this Agreement is terminated for any reason and Shareholder provides professional services in a business…in competition with JCCS the Shareholder agrees as follows:
>
> To pay to JCCS an amount equal to one hundred (100%) of the gross fees billed by JCCS to a particular client over the twelve month period immediately preceding such termination, if the client was a client of JCCS within the twelve month period prior to Shareholder's leaving JCCS' employment…and the particular client is thereafter within one year of date of termination served by Shareholder's partners, or any professional services organization employing the Shareholder.

2

¶6 Jerry Lehman, JCCS's CEO, sent Wrigg a letter in May 2009 in which he informed Wrigg that JCCS would not renew Wrigg's Agreement. The Agreement was set to expire on June 30, 2009. The letter stated that this outcome was best for JCCS and Wrigg "[g]iven the culture in the Helena office…." The letter also informed Wrigg that JCCS would pay Wrigg's salary through June 30, 2009, although Wrigg's employment would end immediately. Lehman concluded the letter by reminding Wrigg of the JCCS covenant.

¶7 Wrigg began seeking employment with other accounting firms. These firms expressed concerns about hiring Wrigg, in part, due to the JCCS covenant. Rudd and Company (Rudd) eventually hired Wrigg. Wrigg accepted this employment with a significant pay cut. Wrigg had earned an annual salary of $154,000 while at JCCS. Wrigg would earn $87,000 at Rudd. Wrigg agreed to the significant pay cut due to Rudd's concerns about the JCCS covenant.

¶8 Wrigg concedes that she worked for, and solicited business from, JCCS's clients within a year of termination. JCCS sent Wrigg a demand letter that sought compensation under the terms of the JCCS covenant. Wrigg filed an action for declaratory judgment in District Court to determine whether JCCS could enforce the covenant. The District Court applied the *Dobbins* test to determine that the covenant was reasonable, and therefore, could be enforced. Wrigg appeals.

STANDARD OF REVIEW

¶9     We review for correctness a district court's interpretation of law pertaining to a declaratory judgment ruling. *In re Estate of Marchwick*, 2010 MT 129, ¶ 8, 356 Mont. 385, 234 P.3d 879.

## DISCUSSION

¶10    *Can an employer enforce a covenant not to compete when the employer ends the employment relationship?*

¶11    Montana law strongly disfavors covenants not to compete. *Access Organics, Inc. v. Hernandez*, 2008 MT 4, ¶ 17, 341 Mont. 73, 175 P.3d 899; *see* § 28-2-703, MCA. As a result, we construe strictly covenants not to compete. *Access Organics,* ¶ 17. We also read covenants in a light most favorable to the employee. *Dumont v. Tucker,* 250 Mont. 417, 421, 822 P.2d 96, 98 (1991). We void covenants that act as a full restraint on trade and in absence of an express statutory exception. *Mungas v. Great Falls Clinic, LLP*, 2009 MT 426, ¶¶ 39-40, 354 Mont. 50, 221 P.3d 1230 (citing *Dobbins, De Guire & Tucker, P.C. v. Rutherford, MacDonald & Olson*, 218 Mont. 392, 396, 708 P.2d 577, 579 (1985)); § 28-2-703, MCA.

¶12    Wrigg agrees that the JCCS covenant imposes a partial restraint on trade. We review for reasonableness covenants that impose a partial restraint on trade. *Mont. Mt. Prods. v. Curl*, 2005 MT 102, ¶¶ 11-15, 327 Mont. 7, 112 P.3d 979 (citing *Dobbins,* 218 Mont. at 397, 708 P.2d at 580). A covenant that restrains trade only partially must meet the following three elements in order to be considered reasonable:

(1) The covenant should be limited in operation either as to time or place;

(2) the covenant should be based on some good consideration; and

4

(3) the covenant should afford reasonable protection for and not impose an unreasonable burden upon the employer, the employee, or the public.

*Mungas,* ¶ 39 (citing *Dobbins*, 218 Mont. at 397, 708 P.2d at 580).

¶13 The District Court determined that the JCCS covenant satisfied all three elements. JCCS covenant is limited in time—one year—and place—Lewis and Clark County and its contiguous counties. The District Court also found that consideration accompanied the JCCS covenant. Wrigg had accepted the JCCS covenant each time that she signed a new employment contract. The District Court further determined that the JCCS covenant satisfied the third element as it did not entirely prevent Wrigg from practicing her profession. The District Court did not address whether the employer's termination of the employment relationship affected a covenant's enforcement.

¶14 Wrigg primarily disputes the District Court's failure to consider whether JCCS can claim a business interest in the JCCS covenant. Wrigg argues that JCCS must assert a legitimate business interest in order to enforce the JCCS covenant. Wrigg suggests that the District Court should have concluded that any employer—including JCCS—lacks a legitimate business interest in a covenant when it terminates the employment relationship without cause.

¶15 JCCS provides no case law where a court has enforced a covenant when the employer has ended the employment relationship. JCCS also offers no policy argument to offset Montana's public policy against restrictive covenants, especially when an employer

terminates the employment relationship. JCCS primarily contends instead that our case law binds us to rule in its favor.

¶16 JCCS relies heavily on *Dobbins* to argue the reasonableness of the JCCS covenant. *Dobbins*, 218 Mont. at 397, 708 P.2d at 580. JCCS correctly notes that the language in the *Dobbins* covenant mirrors the language in the JCCS covenant. *Dobbins*, 218 Mont. at 394, 708 P.2d at 578. JCCS asserts that its use of the language deemed reasonable in *Dobbins* means that the JCCS covenant is per se reasonable. JCCS misinterprets *Dobbins*.

¶17 The accountant in *Dobbins* left his accounting firm with whom he had signed a covenant not to compete. *Dobbins*, 218 Mont. at 394, 708 P.2d at 578. The firm sought to enforce the covenant upon the accountant's departure. The district court deemed the covenant unenforceable as a matter of law. *Dobbins*, 218 Mont. at 394, 708 P.2d at 578. This Court reversed. The Court characterized the covenant as only a partial restraint on trade that could be enforced if its terms were reasonable. *Dobbins*, 218 Mont. at 396, 708 P.2d at 580. The Court remanded to allow the trial court to make factual findings as to the covenant's reasonableness. *Dobbins*, 218 Mont. at 397, 708 P.2d at 580.

¶18 The Court relied largely on the formulation developed in 13 A.L.R. Fourth 661 to guide the district court on remand. The Court sought to balance "the competing interests" of the public as well as the employer and the employee. *Dobbins,* 218 Mont. at 397, 708 P.2d at 580. *Dobbins* accordingly did not determine that enforcement of a covenant that uses the same language as the JCCS covenant would be reasonable as a matter of law. *Dobbins* simply held that covenants, like the JCCS covenant, should be subject to a reasonableness

6

analysis under appropriate circumstances. These circumstances require that legitimate business reasons exist to justify the covenant.

¶19 This requirement acknowledges the long standing principle that a covenant that serves no legitimate business interest necessarily is oppressive and invalid. Richard A. Lord, *Williston on Contracts* Vol. 6, § 30:4, 164-75 (4th ed., West 2009). This commentator recognized that a covenant "must be ancillary to a legitimate business undertaking" to be enforced in most jurisdictions based on deep, historical roots of this requirement in English and American common law. Lord, § 30:4 at 164-75. Section 188(1)(a) of the *Restatement (Second) of Contracts*, (1981), similarly proposes that a covenant may not be enforced if the "restraint is greater than is needed to protect the [employer's] legitimate interest." The obvious implication is that a covenant without a legitimate interest is unenforceable as it necessarily imposes a greater restraint than is needed.

¶20 Courts in most jurisdictions have agreed. For example, the New Hampshire Supreme Court analyzes a covenant's enforceability by addressing the reasonableness of a given restraint. The court assesses reasonableness, in turn, by trying "to identify the legitimate interest of the employer." *Syncom Indus., Inc. v. Wood*, 920 A.2d 1178, 1185 (N.H. 2007). Similarly, the Idaho Supreme Court agrees that "[t]he first issue the Court must consider is whether [the employer] has a legitimate interest worthy of protection" in assessing a covenant's enforceability. *Freiburger v. J-U-B Engrs., Inc.*, 111 P.3d 100, 105 (Idaho 2005).

¶21 Courts will not enforce covenants if an employer lacks a legitimate business interest. The Second Circuit declined to address a covenant's reasonableness when it determined that

the employer lacked a legitimate interest in its covenant. *Amer. Inst. of Chem. Engrs. v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982). An employer lacked a legitimate interest in preventing competition from a former employee when the employer's customer list readily was attainable from other sources. *Amer. Inst. of Chem. Engrs.,* 682 F.2d at 387. The Pennsylvania Supreme Court similarly declined to enforce a covenant when it determined than an employer lacked a "protectable business interest." *Hess v. Gebhard & Co.*, 808 A.2d 912, 922 (Pa. 2002). The employer could not claim good will as a legitimate interest when the employer had valued the business's good will at $0 in an earlier contract to purchase the business. *Hess*, 808 A.2d at 922.

¶22    We previously have not addressed directly whether an employer must establish a legitimate business interest in order to enforce a covenant. The *Dobbins* test itself does not explicitly require that an employer possess a legitimate interest in the covenant. The Court in *Dobbins* cited the ALR's requirement, however, that a covenant's restrictions reasonably be related to a "legitimate business interest." *Dobbins,* 218 Mont. at 397, 708 P.2d at 580. *Dobbins*'s emphasis on an employer's legitimate business interest leads us to conclude that the requirement that an employer establish a legitimate interest in a covenant before we review it for reasonableness remains implicit in the *Dobbins* analysis. We adopt expressly the requirement that an employer must establish a legitimate business interest as a threshold step to our analysis of the reasonableness of a covenant. This approach comports with the disfavor of covenants not to compete expressed in Montana law. *Access Organics*, ¶ 17; § 27-2-703, MCA.

8

¶23     The District Court did not address whether the JCCS covenant served a legitimate business interest.  Our previous case law has not defined the nature of the business interest that a covenant serves.  We look instead to other jurisdictions that have analyzed the nature of a legitimate business interest.

¶24     The Restatement defines a legitimate business interest as an interest that must necessarily be enforced to protect the basis of the employer's bargain. *Restatement (Second) of Contracts* at § 188, cmt. b.  An employer possesses a legitimate interest to protect itself from an employee appropriating valuable trade information, good will, and customer relationships to compete directly against—and take business from—his former employer. *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512, 516 (8th Cir. 2007). These legitimate interests necessitate court protection when an employer retains inadequate remedies—absent a covenant—to prevent an employee from appropriating this valuable information to compete against his former employer. *See A.E.P. Indus., Inc. v. McClure,* 302 S.E.2d 754, 763-64 (N.C. 1983).

¶25     An employee, correspondingly, has little disincentive to enrich himself by taking economic advantage of his employer.  A covenant may be necessary, therefore, to prevent an employee from exploiting his employment to later compete and capture the employer's market. *Rao v. Rao,* 718 F.2d 219, 224 (7th Cir. 1983).  This risk can make the covenant necessary as the employer may not get the full value of the employment contract if it cannot confidently give the employee access to confidential information and client relationships

needed for the most efficient performance of his job. *Restatement (Second) of Contracts* at § 188, cmt. b.

¶26    Courts often enforce a covenant when it protects against an employee using customer relationships and information acquired during the employment relationship to compete directly against his former employer. *United Labs, Inc. v. Kuykendall*, 370 S.E.2d 375, 381-82 (N.C. 1988). The employee in *United Labs, Inc.* worked as a sales representative for a chemical company. The sales representative resigned his position with the company to work for the company's competitor. *United Labs, Inc.*, 370 S.E.2d at 378. The sales representative contacted customers whom he had serviced while employed with the chemical company to generate new business. *United Labs, Inc.*, 370 S.E.2d at 378.

¶27    The North Carolina Supreme Court recognized that "protection of customer relationships and goodwill against misappropriation by departing employees" serves as a legitimate protectable interest of the employer. *United Labs, Inc.*, 370 S.E.2d at 381. Good will and customer relationships need protection when the customer primarily communicates with the employer through the employee. *United Labs, Inc.*, 370 S.E.2d at 381. The Court determined that the sales representative had gained extensive personal relationships with the company's customers and intimate knowledge of these customers' buying needs. *United Labs, Inc.*, 370 S.E.2d at 382.

¶28    In contrast, courts seem less likely to determine that a legitimate business interest exists when an employer needs no covenant to protect customer relationships or valuable trade information. *Boisen v. Peterson Flying Serv., Inc.*, 383 N.W.2d 29, 33-35 (Neb.

1986). The employee in *Boisen* worked as a pilot for an aviation services company. *Boisen,* 383 N.W.2d at 31. The company discharged the pilot after four years. *Boisen,* 383 N.W.2d at 32. The pilot sought to establish his own aviation services business after his discharge. The Nebraska Supreme Court declined to enforce the covenant. *Boisen,* 383 N.W.2d at 33-35. The court accepted that an employer's legitimate interest in a covenant prevents an employee from using information or relationships with customers acquired during the scope of the employment relationship to compete with the employer. *Boisen,* 383 N.W.2d at 33-35. The court refused to enforce the covenant, however, where the pilot had gained no valuable trade secrets and had not interacted with any of the company's customers during his employment. *Boisen,* 383 N.W.2d at 34-35.

¶29 These cases demonstrate that a legitimate business interest in a covenant requires that a restriction on post-employment activities be necessary to protect an employer's good will, customer relationships, or trade information. *See Guardian Fiberglass, Inc.,* 509 F.3d at 516; *Boisen,* 383 N.W.2d at 34-35; *Restatement (Second) of Contracts* at § 188, cmt. b. This limitation ensures that businesses will use a covenant only when less restrictive measures will not suffice. Wrigg arguably interacted with JCCS's clients during her employment. JCCS never alleges that Wrigg acquired any JCCS trade secrets or intimate knowledge regarding any special accounting needs of JCCS's clients. We turn then to address whether JCCS can assert a legitimate business interest to enforce the covenant when it terminated Wrigg.

11

¶30    We begin with the premise that Montana law generally disfavors covenants not to compete. *Access Organics, Inc.,* ¶ 17; *see* § 28-2-703, MCA.  This disfavor only heightens when an employer chooses to end the employment relationship and yet seeks to enforce the covenant not to compete. *See Morris v. Schroder Capital Mgmt. Intl.*, 859 N.E.2d 503, 506-07 (N.Y. 2006); *see also C. Monitoring Serv., Inc. v. Zakinski,* 553 N.W.2d 513, 520 (S.D. 1996).  A covenant strips an employee of his livelihood. *See Mont. Mt. Prods.*, ¶ 17.  Courts disfavor this harsh result.  As discussed, however, courts will tolerate this restriction on an employee's livelihood under appropriate circumstances when the *employee* initiates the termination. *See Morris*, 859 N.E.2d at 506-07.

¶31    As noted by the New York court in *Morris*, an employee who contemplates terminating his employment faces a choice.  The employee may choose to preserve his livelihood under an employment contract by remaining with the employer and not competing. On the other hand, the employee may elect to risk losing his livelihood by leaving his employment voluntarily to engage in competition with his former employer. *Morris*, 859 N.E.2d at 506.   The employee makes an informed decision under these circumstances about the risks associated with a covenant's enforcement and voluntarily chooses to encounter those risks. *Morris*, 859 N.E.2d at 506.

¶32    No informed decision exists, however, when an employee departs involuntarily. *Morris*, 859 N.E.2d at 507.   Enforcement of the covenant could impoverish an employee who has done nothing to warrant his termination.  Courts have noted that termination creates inequitable circumstances for an employee.  The Iowa Supreme Court declined to enjoin a

salesman whom the employer had terminated due to a recession. *Ma & Pa, Inc. v. Kelly*, 342 N.W.2d 500, 503 (Iowa 1984). The equities balanced heavily in the salesman's favor as not allowing him to practice his trade would have a profound economic hardship on the employee and his family. *Ma & Pa, Inc.*, 342 N.W.2d at 503. The New York Court of Appeals similarly declined to enforce a covenant when the employer terminated the employee without cause. *Post v. Merrill Lynch, Pierce, Feener, & Smith,* 397 N.E.2d 358, 360-61 (N.Y. 1979). Enforcement would allow an employer "to economically cripple a former employee and simultaneously deny other potential employers his services" when the employer, without reason, creates the employee's need to compete. *Post*, 397 N.E.2d at 360-61.

¶33 Courts accordingly have determined that the circumstances surrounding the employee's departure should be considered before enforcing the covenant. The Tennessee Supreme Court stated that an employer terminating an employee without cause "clearly has a bearing on whether a court…should enforce a non-competition covenant." *C. Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 35 (Tenn. 1984). The South Dakota Supreme Court similarly determined that a stricter standard to enforce covenants applied when the employee had been terminated without cause. *C. Monitoring Serv., Inc.,* 553 N.W.2d at 520. The court cited the consensus among various jurisdictions that courts should scrutinize highly a covenant's enforcement given the involuntary nature of the departure. *C. Monitoring Serv., Inc.,* 553 N.W.2d at 520-21.

¶34    Courts have provided—in accordance with this heightened disfavor—various rationales for why an employer may lack a legitimate business interest when it terminates the employment relationship. For example, the Seventh Circuit determined that a covenant's enforcement proved unnecessary to protect the employer. *Rao,* 718 F.2d at 224. A doctor and a medical practice had entered into a two year employment agreement. *Rao,* 718 F.2d at 221. The agreement included a covenant. The practice informed the doctor that it would not renew the contract after the two year term expired. The practice provided no reason for the non-renewal. *Rao,* 718 F.2d at 221.

¶35    The Seventh Circuit analyzed the covenant's enforceability, under Illinois law, by addressing whether the employer had a legitimate business interest in the covenant. *Rao,* 718 F.2d at 223. The court acknowledged that a covenant serves a legitimate business interest when it prevents an employee from appropriating trade secrets and customer relationships to compete against the employer. *Rao,* 718 F.2d at 224. The court determined that this legitimate interest did not warrant protection, however, when the employer terminates the employment relationship. The practice could have prevented the doctor's competition simply by maintaining the employment relationship. *Rao,* 718 F.2d at 224.

¶36    A Pennsylvania court similarly determined that an employer could not claim a legitimate business interest when it terminated an employee without cause. *Insulation Corp. of Amer. v. Brobston,* 667 A.2d 729, 735 (Pa. Super. 1994). An employer's decision to end the employment relationship reveals the employer's belief that the employee is incapable of generating profits for the employer. *Insulation Corp.,* 667 A.2d at 735. It would be

14

disingenuous for an employer to claim an employee was worthless to the business and simultaneously claim that the employee constituted an existential competitive threat. *Insulation Corp.,* 667 A.2d at 736. The employer could not claim that it was in need of protection, and, therefore, could not demonstrate a legitimate business interest in the covenant.

¶37    We agree that an employer normally lacks a legitimate business interest in a covenant when it chooses to end the employment relationship. Maintenance of the employment relationship represents an employer's best method to prevent competition from an employee. *Rao,* 718 F.2d at 224. An employer needs no covenant to protect its business in these circumstances as the employer sits in the best position to protect itself simply by maintaining the employment relationship. *Rao,* 718 F.2d at 224. An employer also cannot claim that it needs protection from employee competition when the employer has stated implicitly that the employee is incapable of generating profits. *Insulation Corp.,* 667 A.2d at 736. A covenant serves only to prevent competition when an employer chooses to end the employment relationship. *Rao,* 718 F.2d at 224. We do not consider this interest legitimate. An employer assumes the risk of competition from a former employee when it chooses to end the employment relationship.

¶38    We recognize that circumstances may exist in which the employer chooses to end the employment relationship due to conduct of the employee that has proven detrimental to the employer or the employer's clients. This employee conduct, or misconduct, could provide the employer with a legitimate business reason to seek to enforce the covenant. The

15

employer under those circumstances would have to establish the legitimacy of the business interest and the nature of the risk posed by the former employee's competition. *See, e.g., Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577, 583 (N.J. 1971) (refusing to enforce a covenant where the employer had failed to make an adequate evidentiary showing that it needed to enforce the covenant to protect against the employee using trade secrets to compete with the company).

¶39 JCCS argues that the reason for the employee's departure should be immaterial to a covenant's enforceability. JCCS correctly notes that many of our decisions regarding covenants have not specified the circumstances under which the employee departed. *See, e.g., Mont. Mt. Prods.,* ¶ 6. JCCS interprets this lack of specificity as an implicit holding that which party terminates the employment relationship as being irrelevant to the enforceability of covenants. We cannot agree.

¶40 The Court's cases address the issues presented by the parties. Employers primarily raised the issue of a district court's failure to analyze a covenant's reasonableness. *Mungas,* ¶¶ 16, 40; *Mont. Mt. Prods.,* ¶¶ 11-17; *Dobbins*, 218 Mont. at 397, 708 P.2d at 580. Other cases have focused on whether adequate consideration accompanied the covenant. *Access Organics, Inc.*, ¶ 18. The remaining cases involved overly broad covenants under the *Dobbins* test. *Daniels v. Thomas, Dean & Hoskins, Inc.,* 246 Mont. 125, 144-45, 804 P.2d 359, 370-71; *St. Med. Oxygen & Supply v. Amer. Med. Oxygen Co.*, 240 Mont. 70, 74-75, 782 P.2d 359, 370-71 (1989). The Court's lack of specificity regarding the manner by which these previous parties had ended the employment relationship simply means that the parties

16

have not placed before the Court the issue of a covenant's enforcement when the employer chooses to end the employment relationship.

¶41    JCCS finally argues that it never terminated Wrigg. The Agreement with Wrigg had expired. JCCS paid Wrigg through the date that the Agreement expired on June 30, 2009. JCCS contends that it fully performed its contractual obligations under the Agreement and waived performance of Wrigg's obligations. JCCS suggests that a distinction exists between ending employment without cause and deciding not to renew an agreement. JCCS concedes that it must have cause to terminate a contractual relationship, but argues that it faces no legal obligation to renew an expired contract.

¶42    Whether JCCS terminated the Agreement, or it expired under its own terms, proves immaterial to our analysis. JCCS undoubtedly had the right not to renew its Agreement with Wrigg. We face the issue, however, of whether JCCS can assert a legitimate business interest to justify enforcement of its covenant when JCCS chose to end the employment relationship. Our analysis concerning an employer's legitimate interest in the enforceability of covenants applies to both a terminated contract and an expired contract. *See Rao,* 718 F.2d at 221-24.

¶43    A covenant may serve a legitimate business interest when an employee voluntarily leaves his employment to compete against, and take business from, his former employer. *Rao,* 718 F.2d at 224. A court should analyze whether the former employee used trade secrets, customer relationships, or proprietary information that would provide an employee with an unfair advantage. *Boisen,* 383 N.W.2d at 34. An employer would have difficulty

asserting this same legitimate business interest, however, when the employer initiates the termination. *Rao,* 718 F.2d at 224.

¶44     JCCS clearly ended the employment relationship here as evidenced by its May 2009 letter to Wrigg. The letter informs Wrigg that JCCS would not renew the Agreement that was set to expire on June 30, 2009. The letter describes no refusal or failure by Wrigg to comply with JCCS policies or standards. The letter also describes no facts that would give rise to misconduct or allege that Wrigg had failed to perform diligently her employment duties. JCCS elected to terminate its employment relationship with Wrigg, and, accordingly, cannot enforce its covenant under these circumstances. *Rao*, 718 F.2d at 224. We reverse and remand with instructions to the District Court to vacate its declaration that JCCS can enforce its covenant and enter judgment in Wrigg's favor.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BETH BAKER