DA 15-0605

FILED

09/06/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0605

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 218

JUNKERMIER, CLARK, CAMPANELLA, STEVENS, P.C.,
a Montana Professional Corporation,

      Plaintiff and Appellant,

  v.

ALBORN, UITHOVEN, RIEKENBERG, P.C.,
a Montana Professional Corporation, TERRY ALBORN,
PAUL UITHOVEN, CHRISTINA RIEKENBERG, JOE
BATESON, and SHERM VELTKAMP,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                  In and For the County of Gallatin, Cause No. DV 13-736C
                  Honorable George Huss, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Kirk D. Evenson (argued), Thomas A. Marra, Marra, Evenson & Bell,
                P.C., Great Falls, Montana

        For Appellees:

                Michael J. Lilly (argued), Bridget W. leFeber, Berg, Lilly & Tollefsen,
                P.C., Bozeman, Montana

        For Amici:

                Amy D. Christensen, Christensen & Prezeau, PLLP, Helena, Montana

                          Argued and Submitted:  June 8, 2016

                                    Decided:  September 6, 2016

Filed:

                            _____
                                    Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Junkermier, Clark, Campanella, Stevens, P.C. (Junkermier) lost its Bozeman branch office after all but one of its Bozeman shareholders decided to start their own firm, taking most of Junkermier's clients with them. Junkermier sought to enforce a contractual covenant restricting competition, but the Eighteenth Judicial District Court held the agreement unenforceable. The court also rejected Junkermier's claim for damages against some of the Appellees for breach of fiduciary duty.[1] We consider the following issues on appeal:

*1. Whether the District Court erred by failing to analyze the reasonableness of the covenant because it concluded that the underlying contract was unenforceable.*

*2. Whether the District Court erred in concluding that only one Former Shareholder breached a fiduciary duty and that Junkermier failed to prove awardable damages from that breach.*

¶2 We reverse in part and remand.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 Junkermier is a Montana accounting firm based in Great Falls, with offices in other Montana cities that it has acquired through merger or acquisition. Junkermier merged with the Bozeman accounting firm of Veltkamp, Stannebein, and Bateson, P.C. (Veltkamp Firm) in 2002. At the time of the merger, the Veltkamp Firm had four

---

[1] Appellees are Alborn, Uithoven, Riekenberg, P.C., Terry Alborn, Paul Uithoven, Christina Riekenberg, Joe Bateson, and Sherm Veltkamp. Alborn, Uithoven, Riekenberg, P.C., does business as Amatics CPA Group and we refer to it as Amatics. We refer to the individual Appellees collectively as Former Shareholders.

2

shareholders—Former Shareholders Uithoven, Bateson, and Veltkamp, and nonparty Harry Stannebein. Under the merger agreement, Junkermier and the Veltkamp Firm equalized their book value and the Veltkamp Firm shareholders received equal value shares of Junkermier. The merger agreement provided that the Veltkamp Firm could be "spun-off" if either party determined within eighteen months that the merger was not in its best interest. Neither party exercised this option. Former Shareholder Riekenberg was a non-shareholder employee at the Veltkamp Firm who became a Junkermier employee and shareholder after the merger.

¶4 Former Shareholder Alborn became a Junkermier shareholder in 1980. He served on Junkermier's board of directors and, by the spring of 2013, he had been the Junkermier Bozeman office branch manager for nearly ten years. Former Shareholders were five of the six Junkermier shareholders in Junkermier's Bozeman office and held nearly fifteen percent of Junkermier's shares. All Junkermier shareholders are subject to a Stock Purchase and Redemption Agreement (Stock Agreement), which requires that shareholders be employed by Junkermier in a professional capacity, restricts the transfer of shares, and details the parties' obligations regarding the sale and redemption of shares.

¶5 Throughout their employment with Junkermier, Former Shareholders—like all Junkermier shareholders—were employed under the terms of an annual Shareholder's Employment Agreement (Employment Agreement). The Employment Agreement defines the parties' various rights and obligations and contains a covenant restricting competition (Covenant) that provides, in part:

3

7. **POST-EMPLOYMENT REPRESENTATION OF CLIENTS.** If this Agreement is terminated for any reason and Shareholder provides professional services . . . in competition with [Junkermier] the Shareholder agrees as follows:

   a. To pay to [Junkermier] an amount equal to one hundred percent (100%) of the gross fees billed by [Junkermier] to a particular client over the twelve month period immediately preceding such termination, if the client was a client of [Junkermier] within the twelve month period prior to Shareholder's leaving [Junkermier's] employment (hereinafter "particular client"), and the particular client is thereafter within one year of date of termination served by Shareholder, Shareholder's partners, or any professional services organization employing the Shareholder.

   .   .   .

   f. For purposes of this Section, a Shareholder shall be considered to be in competition with [Junkermier], by providing professional services within the county of the Shareholder's primary office (the office through which the Shareholder provides the majority of his professional services), or any county contiguous thereto.

Under the Employment Agreement, Former Shareholders acknowledged that they were entering into the agreement "with full understanding of the nature and extent covered by the" Covenant, and that they realized that the Employment Agreement "would not be entered into without the [Covenant] contained herein."

¶6 The Employment Agreement contained also a section entitled "Disclosure of Information." That section prohibited shareholders from disclosing confidential information—defined to include "lists of [Junkermier's] clients." The disclosure term made clear that it applied both during the agreement's term and "at all times after the termination of employment with [Junkermier]." The Employment Agreement specified

4

further that any and all confidential information was "the sole and exclusive property of [Junkermier]."

¶7     Under the Employment Agreement, Junkermier agreed "to compensate the Shareholder at a mutually agreeable amount." The agreement specified further that Former Shareholders would be paid a salary "pursuant to the policies and procedures contained in the [Junkermier] Employee Manual." Former Shareholders were paid a base salary by Junkermier and they also received bonuses when approved by the board of directors, typically on an annual basis.

¶8     The Employment Agreement's term would "expire one (1) year from the date of execution." It also could be terminated upon the happening of certain specified events. The Employment Agreement provided further that it could be extended for a one-year term by Junkermier on written notice.

¶9     In June 2012, Former Shareholders were notified that Junkermier was exercising its option to extend the terms of their most recent Employment Agreements through June 30, 2013. In the spring of 2013, Former Shareholders began discussing splitting from Junkermier due to various frustrations with the firm. Former Shareholders retained an attorney, who suggested that the Covenant was not enforceable. In early June 2013, Former Shareholders met with a consultant to get advice about splitting from Junkermier.

¶10    Around that same time, Former Shareholders informed Junkermier CEO Jerry Lehman in writing that they wanted to discuss leaving Junkermier. Shortly after, the majority of Former Shareholders met with Lehman. Lehman then informed the other

Junkermier shareholders that Former Shareholders intended to leave. He called a special meeting of the shareholders to discuss the topic. At that meeting the other Junkermier shareholders appointed a committee to negotiate the details of Former Shareholders' split from the firm. The committee and Former Shareholders discussed a transition; each side made proposals regarding the Bozeman office's clients, but they never reached an agreement. On June 20, 2013, Lehman met with the Bozeman office employees and informed them that Former Shareholders were leaving. Also that same day, Junkermier sent all the Bozeman office employees a "COBRA Election Notice" informing them that their employment would end on June 30, 2013.

¶11 The last week of June 2013, Former Shareholder Alborn prepared a "to do list" assigning various tasks to Former Shareholders and other Bozeman office employees relating to forming the new Amatics accounting firm, and filed articles of incorporation for Amatics. Former Shareholders worked for Junkermier until June 30, 2013. The next day, Former Shareholders and almost all of the Junkermier Bozeman staff began work at Amatics. Amatics ran a full-page advertisement that same day in the *Bozeman Daily Chronicle* announcing its formation and new location. The ad stated that Amatics had "evolved" from Junkermier.

¶12 Prior to Former Shareholders' leaving Junkermier, a Junkermier employee downloaded a copy of Junkermier's Bozeman client list at Former Shareholder Alborn's request. The client list was taken to a local printing shop to print letters to the clients. On its first day of business, Amatics sent the letters to all of the clients on the

6

downloaded client list informing them about the split from Junkermier. The letter included a document that asked the clients to choose whether they wanted to continue their relationship with Junkermier or to continue their relationship "with the Shareholders and staff of the former [Junkermier] Bozeman office, now known as [Amatics]." Junkermier sent its own letter to the Bozeman clients informing them of the changes in the office in mid-July. Ultimately, about 2,100 of the 2,400 clients on the client list transferred their accounting work from Junkermier to Amatics. A significant number of these clients had preexisting relationships with Former Shareholders Uithoven, Bateson, Veltkamp, and Riekenberg from their days at the Veltkamp Firm.

¶13 Following the split, Junkermier filed a complaint to declare the Covenant enforceable and to recover damages. The complaint included claims for breach of contract and breach of fiduciary duty against Former Shareholders. Pursuant to the Covenant, Junkermier sought 100% of the gross fees that Junkermier billed in fiscal year 2013 to clients that were serviced by Amatics in fiscal year 2014. The complaint originally named a number of other defendants who had left Junkermier's Bozeman office, but they were voluntarily dismissed, leaving Former Shareholders and Amatics as the only defendants. Former Shareholders asserted statutory wage, breach of contract, and breach of the implied covenant of good faith and fair dealing counterclaims that eventually also were dismissed.

¶14 On the parties' cross-motions for summary judgment, the District Court held that the Employment Agreement was unenforceable because it was merely an agreement to

7

agree and also was a contract of adhesion. The court concluded, however, that there were issues of material fact regarding the breach of fiduciary duty claim. It set a bench trial to resolve the issue.

¶15 Following three days of trial, the District Court determined that Junkermier is not a closely held corporation and concluded that Former Shareholders, other than Alborn, owed no legal duty to Junkermier. The court concluded that Alborn breached his fiduciary duty to Junkermier. The court held, however, that Alborn was not liable for damages because Junkermier failed to prove damages by substantial evidence. Junkermier appeals the District Court's summary judgment and trial rulings.

## STANDARDS OF REVIEW

¶16 We review summary judgment rulings de novo. *Garza v. Forquest Ventures, Inc.*, 2015 MT 284, ¶ 11, 381 Mont. 189, 358 P.3d 189. Summary judgment is appropriate when the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. M. R. Civ. P. 56(c)(3); *Garza*, ¶ 11. If this burden is met, the burden shifts to the nonmoving party to establish with substantial evidence—as opposed to mere denial, speculation, or conclusory assertions—that a genuine issue of material fact does exist or that the moving party is not entitled to judgment as a matter of law. *Garza*, ¶ 11.

¶17 We review a district court's findings of fact to determine if they are clearly erroneous. M. R. Civ. P. 52(a)(6); *Letica Land Co., LLC v. Anaconda-Deer Lodge Cnty.*, 2015 MT 323, ¶ 13, 381 Mont. 389, 362 P.3d 614. A finding is clearly erroneous if it is

8

not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *Letica Land Co., LLC*, ¶ 13. We review a district court's conclusions of law to determine if they are correct. *Letica Land Co., LLC*, ¶ 13.

## DISCUSSION

¶18 *1. Whether the District Court erred by failing to analyze the reasonableness of the Covenant because it concluded that the underlying contract was unenforceable.*

¶19 The District Court acknowledged that in order to be considered reasonable, a covenant not to compete must meet each of three factors that we articulated in *Dobbins, De Guire & Tucker, P.C. v. Rutherford, MacDonald & Olson*, 218 Mont. 392, 708 P.2d 577 (1985) (hereafter *Dobbins*). The court concluded that while there were genuine factual issues as to some of the *Dobbins* elements, the Employment Agreement as a whole was not enforceable. Relying on cases from other jurisdictions, the court concluded that the amount of compensation is an essential term in a contract for services. Because the Employment Agreement did not specify the amount of compensation, or provide a "formula, mode, or provision" for determining compensation, the District Court determined that the agreement was an unenforceable agreement to agree. The court concluded further that the Employment Agreement was unenforceable because it was a contract of adhesion. The court thus held that the Covenant was unenforceable because the Employment Agreement was unenforceable.

9

**A. Junkermier's arguments pertaining to the Employment Agreement's enforceability**

¶20 Former Shareholders contend that Junkermier did not respond to their summary judgment arguments that the Employment Agreement lacked an adequate compensation term and was only an agreement to agree. Because it was Junkermier's duty to respond as the party opposing the motion, Former Shareholders claim that the District Court had no duty to develop arguments on Junkermier's behalf. The District Court adopted Former Shareholders' position and granted summary judgment to them in large part because Junkermier failed to address the arguments. Former Shareholders contend that Junkermier cannot now raise the arguments it failed to raise with the District Court.

¶21 In response, Junkermier claims that it specifically addressed the issues of compensation and whether the Employment Agreement was an agreement to agree. As such, Junkermier argues that its arguments are properly before this Court on appeal.

¶22 A review of the record demonstrates that although Junkermier did not develop the argument, it did address briefly Former Shareholders' claims regarding the issues of compensation and agreements to agree both in its briefing and in oral arguments before the District Court on summary judgment. Either way, Junkermier's alleged failure to respond to Former Shareholders' arguments did "not relieve the District Court of the duty to engage in a Rule 56 analysis when presented with [Former Shareholders'] motion for summary judgment." *Chapman v. Maxwell*, 2014 MT 35, ¶ 11, 374 Mont. 12, 322 P.3d 1029. Thus, the District Court was required to look beyond the parties' briefs in concluding on summary judgment that the Employment Agreement was unenforceable.

10

M. R. Civ. P. 56(c)(3); *Chapman*, ¶ 11. We do the same in our de novo review of the District Court's conclusion that the Employment Agreement was unenforceable.

**B. The Employment Agreement's enforceability**

¶23 Junkermier contends that the District Court's ruling is wrong because the "amount of the salary is not the consideration for the [Covenant], the employment itself is." Junkermier claims that the Employment Agreement was an enforceable contract, supported by adequate consideration, because Former Shareholders had employment and they had been compensated for their work through the end of their employment. Junkermier points out that Former Shareholders admitted as much in their counterclaims when they asserted that the parties mutually agreed upon a compensation amount and that they were compensated for their employment at Junkermier. Junkermier accordingly claims that the agreement was not merely an agreement to agree.

¶24 Junkermier contends also that the District Court erred in determining that the Employment Agreement was a contract of adhesion because Former Shareholders were not just Junkermier employees, but officers, shareholders, and a director. The Employment Agreement, Junkermier maintains, was effectively an agreement that Former Shareholders entered into with themselves as owners of Junkermier. Junkermier contends that Former Shareholders' bargaining power precludes a conclusion that the Employment Agreement was an adhesion contract.

¶25 Former Shareholders counter that the Employment Agreement's compensation term does not include the amount of compensation or a mode or means to calculate it.

11

Therefore, Former Shareholders claim that the agreement does not include all of an employment contract's essential terms and therefore is unenforceable. Former Shareholders argue that the Employment Agreement is merely an agreement to agree because it left the compensation to be determined later. Former Shareholders also contend that the Employment Agreement is a contract of adhesion because they "had no meaningful choice in signing" the agreement, they were in a weaker bargaining position, and the agreement's terms are more favorable to Junkermier.

**I. Whether the Employment Agreement was an agreement to agree**

¶26 "Both the existence of a contract and its interpretation are questions of law which we review for correctness." *Hurly v. Lake Cabin Dev., LLC*, 2012 MT 77, ¶ 14, 364 Mont. 425, 276 P.3d 854. In order to be binding, "[a] contract must contain all its essential terms." *Hurly*, ¶ 17 (citation and internal quotations omitted). A contract's essential elements include "a sufficient cause or consideration." Section 28-2-102(4), MCA.

¶27 Consideration is:

> Any benefit conferred or agreed to be conferred upon the promisor by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by the person, other than prejudice that the person is at the time of consent lawfully bound to suffer, as an inducement to the promisor is a good consideration for a promise.

Section 28-2-801, MCA. In other words, "[c]onsideration requires that the contracting parties, each as to the other, confer some legal benefit and/or incur some detriment as an inducement to performance." *State Pub. Employee's Ass'n v. Office of the Governor*, 271

12

Mont. 450, 455, 898 P.2d 675, 678 (1995) (citing § 28-2-801, MCA); *accord Larson v. Green Tree Fin. Corp.*, 1999 MT 157, ¶ 26, 295 Mont. 110, 983 P.2d 357 ("When an agreement contains a bargained-for exchange in legal positions between parties, the agreement becomes a legally enforceable contract."). "A written instrument is presumptive evidence of consideration." Section 28-2-804, MCA.

¶28 The written Employment Agreement "contains a bargained-for exchange in legal positions between [the] parties." *Larson*, ¶ 26. Former Shareholders agreed to provide professional accounting services on behalf of Junkermier, and Junkermier agreed to employ Former Shareholders to provide those professional services. The Employment Agreement specifies the parties' performance obligations to each other: Junkermier would employ and compensate Former Shareholders, and Former Shareholders would provide professional services, would not disclose confidential information, and would not compete without paying liquidated damages. And, to quote Former Shareholders' counterclaims, the Stock Agreement and the Employment Agreement "were interdependent. The execution of one of the Agreements *was consideration* for the execution of the other Agreement." (Emphasis added.) Not only was each Former Shareholder paid a salary, each was issued stock in Junkermier as called for by the Stock Agreement once he or she became an employee under the Employment Agreement. Clearly, Junkermier and Former Shareholders, "each as to the other, confer[red] some legal benefit and/or incur[red] some detriment as an inducement to performance." *State Pub. Employee's Ass'n*, 271 Mont. at 455, 898 P.2d at 678.

13

¶29    We are unpersuaded by Former Shareholders' contention that the Employment Agreement is unenforceable because it does not include the amount of compensation or a mode or means to calculate compensation. Former Shareholders correctly assert that an "agreement that requires the parties to agree to material terms in the future is not an enforceable agreement." *GRB Farm v. Christman Ranch, Inc.*, 2005 MT 59, ¶ 11, 326 Mont. 236, 108 P.3d 507. Former Shareholders, however, cite no cases in which we have held that the amount of compensation, or a means or mode of calculating compensation, is a mandatory term in an employment contract.

¶30    A contract "must be complete and certain in all essential matters included within its scope." *Steen v. Rustad,* 132 Mont. 96, 106, 313 P.2d 1014, 1020 (1957). Thus, the Employment Agreement could not be enforced if its terms were "not sufficiently certain to make the precise act which [was] to be done clearly ascertainable." *GRB Farm*, ¶ 11 (citation and internal quotations omitted); *accord Steen*, 132 Mont. at 106, 313 P.2d at 1020 (concluding that in order for a contract to be enforceable "[n]othing must be left to conjecture or surmise, or be so vague as to make it impossible for the court to glean the intent of the parties from the instrument, or the acts sought to be enforced"). On the other hand, "absolute certainty and completeness in every detail is not a prerequisite of specific performance, only reasonable certainty and completeness being required." *Steen*, 132 Mont. at 106, 313 P.2d at 1020.

¶31 The parties' intent in entering into the Employment Agreement is clear—Junkermier agreed to employ Former Shareholders, and Former Shareholders agreed to be employees of Junkermier. Under the Employment Agreement's "Compensation" term, Former Employees would be compensated a "monthly salary (less applicable withholdings) . . . pursuant to the policies and procedures contained in the [Junkermier] Employee Manual." That Junkermier and Former Shareholders settled upon a base salary and that Junkermier paid Former Shareholders that base salary demonstrate that the parties "mutually agree[d]" to a compensation amount per the Employment Agreement. The employee manual—explicitly incorporated in the Employment Agreement—conferred additional benefits to Former Shareholders and specified additional performance obligations between the parties. The Stock Agreement—which was "interdependent" with the Employment Agreement—substantiates that the scope of the parties' contractual relationship was "complete and certain in all essential matters." *Steen*, 132 Mont. at 106, 313 P.2d at 1020. Although the parties did not fix a specific compensation amount, "there was sufficient information provided in the contract to make the parties' obligations 'clearly ascertainable.'" *Hurly*, ¶ 21 (quoting *GRB Farm*, ¶ 11).

¶32 We do not have to surmise the mutual obligations in the Employment Agreement. Its promise and acceptance of employment are sufficient consideration to establish an essential term of a contract. The District Court erred in declaring the Employment Agreement an unenforceable agreement to agree.

## II. Whether the Employment Agreement was a contract of adhesion

¶33 The fundamental tenet of "contract law is freedom of contract; parties are free to mutually agree to terms governing their private conduct as long as those terms do not conflict with public laws." *Arrowhead Sch. Dist. No. 75 v. Klyap*, 2003 MT 294, ¶ 20, 318 Mont. 103, 79 P.3d 250. A court will find a contract unconscionable, however, "if the bargaining process itself had some inherent unfairness that actually prevented the contract from being freely negotiated and thus defeated the principle of freedom of contract." *Arrowhead Sch. Dist. No. 75*, ¶ 49. A contract is unconscionable if: (1) it is a contract of adhesion, and (2) the contractual terms unreasonably favor the drafter. *Arrowhead Sch. Dist. No. 75*, ¶ 48. Here, the District Court found that the Employment Agreement was a contract of adhesion; we therefore analyze the unconscionability inquiry's first factor.

¶34 A contract of adhesion is "a standard form contract prepared by one party, to be signed by the party in a weaker position (usually a consumer), who adheres to the contract with little or no choice about its terms." *Graziano v. Stock Farm Homeowner's Ass'n*, 2011 MT 194, ¶ 18, 361 Mont. 332, 258 P.3d 999 (citation omitted). "Disparity in bargaining power is an essential element of a contract of adhesion." *Day v. CTA, Inc.*, 2014 MT 119, ¶ 10, 375 Mont. 79, 324 P.3d 1205. Yet, mere disparity "in bargaining power does not equate to unenforceability and not all standardized contracts are unenforceable as adhesion contracts." *Denton v. First Interstate Bank of Commerce*, 2006 MT 193, ¶ 33, 333 Mont. 169, 142 P.3d 797.

16

¶35 Granted, the Employment Agreement was a standard form contract—each Junkermier shareholder signed the same Employment Agreement. Missing, however, is the essential disparity in bargaining power between the parties. For starters, Former Shareholders are not "unsophisticated and unsuspecting ordinary citizens" entering into a contract "as part of the intercourse of daily life." *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 55, 310 Mont. 123, 54 P.3d 1. Rather, they are "sophisticated business person[s]" who entered into contracts to which they had been subject the entire time they worked at Junkermier. *Denton*, ¶ 33. Former Shareholders point to no evidence that shows that they "required specific protection or [were] improvident in [their] business dealings." *Denton*, ¶ 33. To the contrary, the evidence shows that Former Shareholders all have extensive accounting experience and were sophisticated and shrewd enough to form and run a new accounting firm.

¶36 In addition, Former Shareholders were not merely Junkermier employees—they owned nearly fifteen percent of Junkermier's shares at the time they left; Former Shareholder Bateson was on Junkermier's board of directors immediately prior to the split; and Former Shareholder Alborn was on Junkermier's board of directors from 2006-2012 and was the branch manager for Junkermier's Bozeman office at the time of the split. Former Shareholders' bargaining power is readily distinguishable from the disparity between parties in cases recognizing adhesion contracts. *E.g.*, *Kelker v. Geneva-Roth Ventures, Inc.*, 2013 MT 62, ¶ 31, 369 Mont. 254, 303 P.3d 777 (concluding that "[n]o doubt exists that [a payday lending company] afforded [a

17

consumer] no opportunity to negotiate the terms of the [payday loan] contract"); *Woodruff v. Bretz, Inc.*, 2009 MT 329, ¶¶ 9-10, 353 Mont. 6, 218 P.3d 486 (concluding that a purchase contract between a consumer and a motor home dealer "easily falls within" the adhesion contract definition in part because the consumer "was the weaker party to the transaction" and had a "'relative lack of sophistication'"); *Kloss*, ¶¶ 27, 37 (concluding that agreements between a financial service provider and "a 95 year old widow with no bargaining power and a relative lack of sophistication in such matters" were "clearly contracts of adhesion").

¶37 The fact that Former Shareholders Uithoven, Bateson, and Veltkamp were involved in the merger between Junkermier and the Veltkamp Firm in 2002 casts further doubt on Former Shareholders' contentions that the Employment Agreement was an adhesion contract. Former Shareholder Bateson testified that he participated in the merger negotiations and "did the due diligence" for the merger. The merger agreement's terms explicitly provided, "Each employee of [the Veltkamp Firm] that remains in the employ of [Junkermier] shall sign both an Employment Agreement and Confidentiality Agreement." Junkermier's CEO during the merger, Robert Nebel, testified that the Veltkamp Firm reviewed the Employment Agreement during the merger negotiations. The merger agreement provided further that the former Veltkamp Firm members had the option of splitting from Junkermier within eighteen months of its effective date if they "determine[d] that [the] Merger [was] not in their best interest." Former Shareholders Uithoven, Bateson, and Veltkamp did not determine that the Employment Agreement

18

was not in their best interest during the eighteen months they were subject to it and could have opted out. They therefore had a "meaningful choice regarding [the Employment Agreement's] acceptance." *Highway Specialties, Inc. v. State*, 2009 MT 253, ¶ 16, 351 Mont. 527, 215 P.3d 667 (concluding that an adhesion contract is one in which "the weaker bargaining party had no meaningful choice regarding its acceptance").

¶38 We conclude that the District Court erred in determining that the Employment Agreement was an unenforceable adhesion contract. The Employment Agreement is an enforceable contract.

**C. The Covenant**

¶39 Contracts that restrain trade are "strongly disfavor[ed]." *Access Organics, Inc. v. Hernandez*, 2008 MT 4, ¶ 17, 341 Mont. 73, 175 P.3d 899. Consequently, covenants are to be construed "strictly" and "in favor of rather than against the interest of the" party who is subject to the covenant. *Access Organics, Inc.*, ¶ 17 (citation and internal quotations omitted). Covenants that act as an absolute prohibition on trade—absent an express statutory exception—are void. Section 28-2-703, MCA; *Mungas v. Great Falls Clinic, LLP*, 2009 MT 426, ¶¶ 37-38, 354 Mont. 50, 221 P.3d 1230. Yet, when "a contract contains a restraint on a person's ability to practice their profession, but such restraint is not an absolute prohibition," a determination must be made as to the covenant's reasonableness. *Mungas*, ¶ 39.

¶40 Here, the District Court concluded, and we agree, that the Covenant only partially restrains trade. The Covenant is not an absolute prohibition on Former Shareholders'

19

right to engage in their profession. Nor does it prohibit them from competing with Junkermier. Rather, the Covenant requires Former Shareholders to pay liquidated damages if they provide services to a Junkermier client within one year of their departure from the firm. Because the Covenant is not an absolute prohibition, it cannot be declared invalid as a matter of law. *Mungas*, ¶ 38. Rather, when a covenant only partially restrains trade, we have repeatedly examined the following factors, articulated in *Dobbins*, to determine the reasonableness of an employment agreement's covenant not to compete:

1) The covenant should be limited in operation either as to time or place;

2) the covenant should be based on some good consideration; and

3) the covenant should afford a reasonable protection for and not impose an unreasonable burden upon the employer, the employee or the public.

*E.g.*, *Mungas*, ¶ 39; *Access Organics, Inc.*, ¶ 16; *Mont. Mt. Prods. v. Curl*, 2005 MT 102, ¶ 11, 327 Mont. 7, 112 P.3d 979; *Daniels v. Thomas, Dean & Hoskins, Inc.*, 246 Mont. 125, 144, 804 P.2d 359, 370 (1990); *State Medical Oxygen & Supply v. American Medical Oxygen Co.*, 240 Mont. 70, 74, 782 P.2d 1272, 1275 (1989); *Dobbins*, 218 Mont. at 397, 708 P.2d at 580. The *Dobbins* test "requires a balancing of the competing interests of the public as well as the employer and employee" in order to determine whether a covenant constitutes a restraint on trade prohibited by § 28-2-703, MCA. *Dobbins*, 218 Mont. at 397, 708 P.2d at 580.

¶41 Junkermier asserts that the District Court erred by not determining whether the Covenant was reasonable under *Dobbins* and its progeny. Junkermier contends that the

20

Covenant is similar to other covenants that this Court has determined are partial restraints on trade. Junkermier asserts that the Covenant satisfies the *Dobbins* test as a matter of law because the Covenant was limited as to both time and place, it was based on consideration, and the Covenant serves a legitimate business interest. Accordingly, Junkermier asserts that the Covenant is reasonable and should have been enforced.

¶42 Former Shareholders contend first that the Covenant does not apply because the Employment Agreement expired by its terms. Given the use of the terms "terminated" and "expired" in the Employment Agreement, the common meaning of the terms, and Junkermier's own interpretation of the terms, Former Shareholders argue that this Court should construe the Covenant to be applicable only if Junkermier terminated the Employment Agreement. Former Shareholders contend next that questions of fact prevent a conclusion that the Covenant was supported by adequate consideration or that it was reasonable. Finally, Former Shareholders allege that Junkermier did not have a legitimate business interest in the Covenant because its actions following Former Shareholders' departure demonstrate that the Covenant was not necessary to protect its goodwill, customer relations, and trade information.

¶43 Both parties rely on *Wrigg v. Junkermier, Clark, Campanella, Stevens, P.C.*, 2011 MT 290, 362 Mont. 496, 265 P.3d 646, to support their respective arguments regarding the Covenant's reasonableness. In *Wrigg*, an accountant who was subject to the same Junkermier covenant at issue here was informed that her employment agreement would not be renewed. *Wrigg*, ¶¶ 5-6. The "dispositive issue" in *Wrigg* was whether an

21

employer could "enforce a covenant not to compete when the employer ends the employment relationship"—an issue that had not yet been addressed by this Court. *Wrigg*, ¶¶ 2-3, 40. We held squarely that our analysis of a covenant's enforceability "applies to both a terminated contract and an expired contract." *Wrigg*, ¶ 42. We concluded that "[w]hether [Junkermier] terminated the [contract], or it expired under its own terms, proves immaterial to our analysis." *Wrigg*, ¶ 42. The District Court correctly rejected Former Shareholders' contentions that the Covenant does not apply here because the Employment Agreement expired and was not terminated. The "interdependent" Stock Agreement also helps to show that whether the Employment Agreement expired or was terminated by one party, both parties retained continuing obligations to each other. That agreement required Junkermier to redeem Former Shareholders' shares after they retired, "whether voluntary or otherwise," or began working at another accounting firm. None of these obligations under the Stock Agreement, nor of those under the Covenant, would materialize unless and until the employment relationship was severed. Former Shareholders' claims that the Employment Agreement's expiration terminated the obligations between them and the firm are inconsistent and we reject their argument.

¶44 We considered in *Wrigg* our statement in *Dobbins* that a covenant must "reasonably be related to a 'legitimate business interest.'" *Wrigg*, ¶ 22 (quoting *Dobbins*, 218 Mont. at 397, 708 P.2d at 580). We made that observation in *Dobbins* while analyzing the "essential" components of a reasonable covenant. *Dobbins*, 218 Mont. at 396-97, 708 P.2d at 580. We said,

in the absence of a controlling statute the enforceability of a covenant not to compete, ancillary to the withdrawal of a partner from an accounting firm, depends upon whether the restriction is reasonably related to the legitimate business interest of the remaining partners and is not unduly burdensome to the covenantor or the public.

*Dobbins*, 218 Mont. at 397, 708 P.2d at 580.

¶45 In the context of *Wrigg*—where it was the employer who terminated the employment relationship—we highlighted "the requirement that an employer must establish a legitimate business interest" in order for a covenant to be enforceable. *Wrigg*, ¶ 22. We observed that "a legitimate business interest [is] an interest that must necessarily be enforced to protect the basis of the employer's bargain." *Wrigg*, ¶ 24 (citing Restatement (Second) of Contracts § 188 cmt b. (1981)). Because an employee has "little disincentive" to take "economic advantage of his employer[,] [a] covenant may be necessary . . . to prevent an employee from exploiting his employment to later compete and capture the employer's market." *Wrigg*, ¶ 25. A covenant protects the employer's interest against an "employee appropriating valuable trade information, good will, and customer relationships to compete directly against—and take business from— his former employer." *Wrigg*, ¶ 24.

¶46 We analyzed cases from various jurisdictions demonstrating that determining whether a covenant serves a legitimate business interest requires the court to weigh a number of factors relating to the employer's and the employee's interests. *Wrigg*, ¶¶ 26-36. We noted that courts enforce covenants when employers demonstrate an interest in protecting themselves from employees who use "customer relationships and

23

information acquired during the employment relationship to compete directly against [their] former employer." *Wrigg*, ¶ 26. In contrast, we noted that courts object to covenants when employers cannot demonstrate that a covenant is needed "to protect customer relationships or valuable trade information." *Wrigg*, ¶ 28. We opined further that when an employee initiates termination of an employment relationship that is subject to a covenant, the employee's interests are diminished because "[t]he employee makes an informed decision . . . about the risks associated with a covenant's enforcement and voluntarily chooses to encounter those risks." *Wrigg*, ¶ 31.

¶47 We pointed out in *Wrigg* that the language of the *Dobbins* factors "does not *explicitly* require that an employer possess a legitimate interest in the covenant." *Wrigg*, ¶ 22. (Emphasis added.) But when the employer discontinues the relationship, consideration of its legitimate business interest is inherent in the court's balancing and examination of "the competing interests of the public as well as the employer and employee." *Dobbins*, 218 Mont. at 397, 708 P.2d at 580; *see Wrigg*, ¶ 22 (concluding that establishing a legitimate business is "implicit in the *Dobbins* analysis"). That balancing process is undertaken within the framework of the *Dobbins* test. *See Myers v. Howmedia Osteonics Corp.*, 2016 U.S. Dist. LEXIS 42583, 25-27 (D. Mont. 2016) (analyzing under the *Dobbins* test's third element whether an employer that terminated the employment relationship had a legitimate interest in a covenant).

¶48 Balancing the *Dobbins* factors requires a particularized inquiry into the facts and circumstances of a particular case. *Daniels*, 246 Mont. at 144, 804 P.2d at 370

24

(concluding that "under certain factual circumstances a covenant restraining a lawful profession . . . may be acceptable if it passes" the *Dobbins* reasonableness analysis). Here, protecting the basis of Junkermier's bargain may justify restrictions against unfettered access to confidential information and established business relationships by Former Shareholders who, without such a restriction, have no disincentive to take advantage of their former employer. Equally, the court must consider Former Shareholders' interests in being able to continue their profession and their clients' ability to maintain the trusted relationships they may have built with their personal accountants. The court must balance the nature of Former Shareholders' relationships with their clients with the protectable interest in Junkermier's client base.

¶49 The District Court did not analyze any of these considerations under *Dobbins* because it held the contract unenforceable. This was error. Such an inquiry is "a factual determination." *Mungas*, ¶ 39; *accord Daniels*, 246 Mont. at 144, 804 P.2d at 370 (concluding that "under certain factual circumstances a covenant . . . may be acceptable if it passes a three part test of reasonableness"). Accordingly, we remand to the District Court to undertake a *Dobbins* analysis.

¶50 *2. Whether the District Court erred in concluding that only one Former Shareholder breached a fiduciary duty and that Junkermier failed to prove awardable damages from that breach.*

**A. Breach of fiduciary duty**

¶51 The District Court made a number of determinations in addressing Junkermier's breach of fiduciary duty claim. First, the court concluded that Junkermier is not a closely

25

held corporation because its ownership and management are not substantially the same. The court grounded this conclusion on its finding that—prior to Former Shareholders leaving—Junkermier had twenty-six shareholders but was governed by a six-member board of directors and was managed by a chief executive officer. The District Court next found that Former Shareholders were unaware that they were considered Junkermier vice-presidents, that none of them were ever assigned any duties as vice-presidents, and that Junkermier's bylaws required the board to appoint shareholders as vice-presidents, which it failed to do. The court therefore concluded that Former Shareholders were not Junkermier officers and consequently owed no legal duty to Junkermier as officers. Similarly, the court concluded that Former Shareholders did not breach any duties as Junkermier employees prior to the termination of their employment because it found no evidence that Former Shareholders solicited other employees to leave Junkermier, solicited clients to leave Junkermier, or misappropriated any business opportunity of Junkermier.

¶52 The court concluded further that Former Shareholder Bateson did not breach a duty to Junkermier as a director because he had resigned from the board in early June 2013 and there was no evidence that he took any action that could be considered a breach of fiduciary duty prior to that time. The court did conclude, however, that Former Shareholder Alborn breached his duty to Junkermier as a branch manager given that he actively participated in planning the split from Junkermier, created the "to do list," and directed an employee to download the client list. But the court found that Alborn's

26

breach of his duty to Junkermier was "largely offset by the subsequent acts of [Junkermier]."

¶53 Junkermier asserts several points of error in these rulings. First, while Junkermier agrees that it is not a statutory close corporation under § 35-9-102, MCA, it asserts that it is a close corporation because its management and ownership are substantially identical and its shares are not publicly traded. As a close corporation, Junkermier contends that Former Shareholders owed fiduciary duties of the "utmost good faith and loyalty" to Junkermier, which they breached by acting for their personal gain. Junkermier contends further that even if it was not a close corporation, the District Court erroneously found that Former Shareholders were not Junkermier officers. Junkermier argues therefore that the District Court erred in concluding that Former Shareholders did not breach their fiduciary obligations as officers. Finally, Junkermier asserts that as employees Former Shareholders owed a duty not to violate Junkermier's bylaws and agreements.

¶54 Former Shareholders respond that Junkermier is not a close corporation because, contrary to Junkermier's assertions, such a determination does not "turn on the fact that a corporation's shares are not publicly traded or are not readily marketable." Rather, Former Shareholders argue, a close corporation is one in which management and ownership are substantially identical. Former Shareholders emphasize that the court's determination on this point is supported by substantial evidence, and therefore is not clearly erroneous. Next, Former Shareholders claim that the District Court correctly concluded that they did not owe Junkermier a fiduciary duty as shareholders or as

officers. Furthermore, Former Shareholders contend, the District Court did not err in determining that Bateson did not breach a fiduciary duty as a director because, as the court found, he resigned as director in early June and his actions before his resignation were in good faith. Former Shareholders do not cross-appeal the District Court's conclusion that Alborn breached his fiduciary duty.

¶55 A corporation that does "not elect to become a statutory close corporation under the Montana Close Corporation Act, §§ 35-9-101 et seq., MCA," still may be considered a close corporation. *Warren v. Campbell Farming Corp.*, 2011 MT 324, ¶ 10, 363 Mont. 190, 271 P.3d 36; *accord Daniels*, 246 Mont. at 134, 804 P.2d at 364. It is well-established that "[a] close corporation is one in which management and ownership are substantially identical to the extent that it is unrealistic to believe that the judgment of the directors will be independent of that of the stockholders." *Warren*, ¶ 27 (quoting *Skierka v. Skierka Bros., Inc.*, 192 Mont. 505, 519, 629 P.2d 214, 221 (1981)) (internal quotations omitted). We have characterized a close corporation relationship as "closely approximat[ing] the relationship between partners." *Daniels*, 246 Mont. at 136-37, 804 P.2d at 366 (citing *Fox v. 7L Bar Ranch*, 198 Mont. 201, 212-13, 645 P.2d 929, 935 (1982)). While "close corporations often utilize share transfer restrictions," we have underscored that this is "[b]ecause ownership and management are so intimately related in such entities." *Gray v. Harris Land & Cattle Co.*, 227 Mont. 51, 53, 737 P.2d 475, 476 (1987). The relationship between management and shareholders is therefore the key component in determining whether a corporation is closely-held. *See Fox*, 198 Mont. at

28

213, 645 P.2d at 935 (citations omitted) ("The enterprise before us is a 'close corporation' in the strictest sense, that is, one in which, regardless of the distribution of the shareholdings, 'management and ownership are substantially identical.'"); *see also Warren*, ¶ 27; *Gray*, 227 Mont. at 53, 737 P.2d at 476; *Skierka*, 192 Mont. at 519, 629 P.2d at 221.

¶56　In determining that Junkermier is not a close corporation, the District Court made the following findings: that Junkermier had twenty-six shareholders but was managed by a CEO and governed by six directors; that Junkermier's bylaws allowed for twenty-five director positions, but it opted not to have that many directors; and that a major reason for Former Shareholders' decision to leave Junkermier was because they felt that shareholders had been removed from the firm's decision-making processes. A review of the record demonstrates that these findings were supported by substantial evidence. Junkermier has not demonstrated clear error in the District Court's finding that Junkermier's ownership and management are not substantially the same. Based on that finding, the District Court did not err in concluding that Junkermier is not a close corporation. We affirm its holding that Former Shareholders did not owe Junkermier a fiduciary duty in their capacity as shareholders. *Cf. Daniels*, 246 Mont. at 136, 804 P.2d at 366 (citation omitted) (concluding that "the fiduciary duty between stockholders of a close corporation is one of the 'utmost good faith and loyalty'").

¶57　Junkermier also urges that Former Shareholders owed a fiduciary duty as officers. Section 35-1-236(2), MCA, provides that "[t]he bylaws of a corporation may contain any

29

provision for managing the business and regulating the affairs of the corporation that is consistent with law or the articles of incorporation." "It is a well[-]established precedent that the bylaws of a corporation . . . constitute a contract between the member and the corporation." *Walker v. Helena Ass'n of Realtors tm, Inc.*, 2000 MT 343, ¶ 16, 303 Mont. 224, 15 P.3d 414 (quoting *Appeal of Two Crow Ranch, Inc.*, 159 Mont. 16, 23, 494 P.2d 915, 919 (1972)); *accord* 18A Am. Jur. 2d *Corporations* § 264 ("The bylaws of a corporation constitute part of a binding broader contract among the directors, officers, and stockholders formed within the statutory framework of the state."). The interpretation of a contract is a question of law that we review for correctness. *Hurly*, ¶ 14.

¶58 Junkermier's bylaws provide that all "shareholders not elected by the board [as other officers] shall be appointed vice-president by the board upon initial receipt of stock." This provision does not deem shareholders to be officers, but—as the District Court determined—requires "board action" for a shareholder to be appointed an officer of Junkermier. Our review of the record demonstrates that the District Court did not misapprehend the effect of the evidence or make a clear mistake in finding that there were no director meeting minutes evidencing Former Shareholders' appointment "as vice-presidents upon the initial receipt of their respective stock, or at any other time," and that Junkermier "offered no evidence of any such board action." The District Court properly determined that Former Shareholders were not Junkermier officers. We thus affirm its ruling that Former Shareholders did not breach a fiduciary duty as officers.

¶59 Finally, we are unpersuaded by Junkermier's contention that Former Shareholder Bateson breached a fiduciary duty as a Junkermier director. Montana statute provides general standards of care for directors of corporations. Section 35-1-418, MCA. The standards apply, however, only if the person is acting as a director. *Cf.* § 35-1-418(4), MCA ("A director is not liable for any action *taken as a director* . . . if the director performed the duties of the director's office in compliance with this section." (Emphasis added)). The District Court therefore concluded correctly that it could consider whether Bateson breached a duty as a director up until the point he resigned from the board in early June 2013. The record supports the District Court's factual findings that there was no evidence that Bateson breached a fiduciary duty during the time he was a director. We conclude that the District Court did not err in determining that Bateson did not breach a fiduciary duty to Junkermier.

¶60 The District Court likewise did not err in concluding that Former Shareholders— other than Alborn—did not breach any duties as Junkermier employees. The court's findings that there was no evidence that, prior to leaving Junkermier, Former Shareholders solicited other employees to leave Junkermier, solicited any Junkermier clients, misappropriated any Junkermier trade secrets, or usurped any Junkermier business opportunity are supported by substantial evidence.

¶61 In sum, we conclude that the District Court did not err in determining that only Former Shareholder Alborn breached a fiduciary duty to Junkermier.

31

**B. Damages stemming from Alborn's breach**

¶62    The District Court concluded first that under § 27-1-317, MCA, Junkermier had the burden of proving both causation and damages stemming from Alborn's breach of fiduciary duty.  The court concluded further that Junkermier's damages claims must be supported by substantial evidence and that damages may not be awarded absent such proof.  Next, the court found that Junkermier's damages claims for breach of fiduciary duty were based on the Covenant.  The court therefore concluded that "[t]he claim for breach of fiduciary duty cannot be used as a basis for attempting to recover damages specified in an unenforceable contract."  Finally, the court determined that Junkermier's damages claim—which the court characterized as 100% of gross fees billed under the Covenant—was not a proper measure of damages because it represented Junkermier's loss of anticipated gross income, was predicated on gross receipts of business, and was the "product of a mere guess or speculation."  Accordingly, the District Court concluded that Junkermier failed to support its damage claim with substantial evidence and was not entitled to collect any damages stemming from Alborn's breach of fiduciary duty.

¶63    To begin with, our conclusion that the Employment Agreement is an enforceable contract repudiates much of the District Court's damages analysis.  The court clearly tied its damages analysis to its determination that the Employment Agreement was unenforceable.  Because we are remanding for analysis of the *Dobbins* factors, we reverse the District Court's ruling.  If the court concludes that the Covenant is valid under *Dobbins*, further analysis of damages may be unnecessary.  If, in contrast, the court

32

rejects the Covenant on the basis of its *Dobbins* reasonableness analysis, the court must reanalyze damages stemming from Alborn's breach of fiduciary duty. In doing so, the District Court must consider the effect of Junkermier's evidence regarding the value of the business it lost stemming from Alborn's breach, the recurring loss of business caused by the breach, and whether Junkermier has proven that loss with reasonable certainty.

¶64 It is undisputed that Alborn breached his fiduciary duty to Junkermier. Thus, it is undisputed that Alborn is liable to Junkermier for that breach. "Once liability is shown, that is the certainty that damages are caused by the breach, then loss of profits on a reasonable basis for computation and the best evidence available under the circumstances will support a reasonably close estimate of the loss by a District Court." *Sebena v. AAA*, 280 Mont. 305, 310, 930 P.2d 51, 54 (1996) (quoting *Stensvad v. Miners & Merchants Bank, Etc.*, 196 Mont. 193, 206, 604 P.2d 1303, 1310 (1982)). Upon remand, if necessary, the District Court shall determine "the amount which will compensate [Junkermier] for all the detriment proximately caused" by Alborn's breach, "whether it could have been anticipated or not." Section 27-1-317, MCA.

## CONCLUSION

¶65 We reverse the District Court's ruling that the Employment Agreement is not an enforceable contract. We affirm the District Court's ruling that Former Shareholders, other than Alborn, owed Junkermier no fiduciary duty. We reverse the court's ruling on damages resulting from Alborn's breach of fiduciary duty. We therefore reverse the judgment of the District Court and remand for the court to analyze the Covenant's

33

reasonableness under *Dobbins* and, if necessary, to analyze Junkermier's damages stemming from Alborn's breach of fiduciary duty.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE
/S/ MICHAEL E WHEAT